FILED & ENTERED

SEP 14 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bakchell  DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>SWING HOUSE REHEARSAL AND RECORDING, INC.,<br><br>Debtor. | Lead Case No. 2:16-bk-24758-RK<br><br>Chapter 11<br><br>Jointly administered with:<br><br>Case No. 2:16-bk-24760-RK<br><br>Converted to Chapter 7 |
| In re:<br><br>PHILIP JOSEPH JAURIGUI,<br><br>Debtor. | |
| SWING HOUSE REHEARSAL AND RECORDING, INC.,<br><br>                      Plaintiff,<br><br>v.<br><br>PHILIP JOSEPH JAURIGUI,<br><br>                      Defendant. | Adv. No. 2:18-ap-01352-RK<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL ON COMPLAINT FOR NON-DISCHARGEABILITY UNDER 11 U.S.C. §§ 523(a)(4) AND (a)(6) AND OBJECTION TO DISCHARGE UNDER 11 U.S.C. §§ 727(a)(2) AND (a)(4)** |
| x Affects Philip Joseph Jaurigui Only. | |

# I.    INTRODUCTION

The undersigned United States Bankruptcy Judge conducted the trial in this adversary proceeding on August 19, 2021, August 20, 2021, September 2, 2021, September 3, 2021, September 17, 2021, September 27, 2021 and April 20, 2022 on Plaintiff Swing House Rehearsal and Recording, Inc.'s Complaint, Adversary Proceeding No. 2:18-ap-01352-RK for Nondischargeability under 11 U.S.C. §§ 523(a)(4) and 523(a)(6) and Objection to Discharge under 11 U.S.C. § 727(a)(4) against Defendant Philip J. Jaurigui along with Plaintiff Jonathan Mover's Complaint, Adversary Proceeding No. 2:18-ap-01351-RK, for Nondischargeability under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), (a)(6) and Objection to Discharge under §§ 727(a)(2) and (a)(4).  Steven R. Fox and Janis G. Abrams, of the Fox Law Corporation, Inc., appeared for Plaintiffs Jonathan Mover ("Mover") and Swing House Rehearsal and Recording, Inc. ("Swing House"), and Leonard Pena, of the law firm of Pena & Soma, APC, appeared for Defendant Philip Joseph Jaurigui (Jaurigui").

After the close of the evidence, the court ordered the parties to lodge proposed findings of fact and conclusions of law, which they did on March 29, 2022 and April 7, 2022 respectively [Electronic Case Filing ("ECF") 106 in this adversary proceeding and ECF 143 in the related adversary proceeding of *Mover v. Jaurigui* in Adv. No. 2:18-ap-1351-RK]. [1] On April 20, 2022, the court conducted a final hearing at which time the court heard closing arguments from the appearing parties after the submission of the proposed findings of fact and conclusions of law.  The findings of fact and conclusions of law set forth below only relate to Adversary Proceeding No. 2:18-ap-01352-RK.

By its Complaint, Plaintiff Swing House seeks an award of damages against Defendant Jaurigui on its claims for monetary damages to be excepted from discharge under 11 U.S.C. §§ 523(a)(4) and 523(a)(6) alleging embezzlement of corporate assets by Jaurigui valued at a minimum of $106,400 and declaratory relief that Jaurigui be denied a discharge of his debts

---

[1] Defendant Jaurigui apparently intended to lodge proposed findings of fact and conclusions of law in both the adversary proceedings against him by Mover and Swing House as the caption of his proposed findings of fact and conclusions of law lodged in the *Mover v. Jaurigui* adversary proceeding also had the caption for this adversary proceeding, though they were not lodged in this adversary proceeding.

under 11 U.S.C. §§ 727(a)(2) and 727(a)(4), alleging that Jaurigui with intent to hinder, delay or defraud a creditor transferred or concealed his property of approximately $140,000 in home equity within one year of the filing of his bankruptcy case and made false oaths on his bankruptcy schedules.

On May 5, 2021, the court entered its Order Approving Joint Pre-Trial Stipulation, Scheduling Further Pre-Trial Conferences and Trial and Setting Trial Procedures [ECF 59] admitting into evidence each of the documents listed in the parties' Pre-Trial Stipulation, based on the parties' Joint Pre-Trial Stipulation [ECF 55 at Appendixes 1 and 2].  Also, Defendant Jaurigui's request to add Exhibit K, certificate of occupancy for 3229 W. Casitas Avenue, Los Angeles, California 90039: Bates No. 0602, into evidence was granted.

At trial, the court received into evidence the declarations of Jonathan Mover ("Mover Dec.") [ECF 69], Alan Friedman (Friedman Dec.) [ECF 70], Genoveva Winsen ("Winsen Dec.") [ECF 71], Philip J. Jaurigui ("Jaurigui Dec.") [ECF 72], and Jared James Nichols ("Nichols or Jared Dec.") [ECF 73], subject to the court's orders on the Evidentiary Objections.

At trial, the court granted Plaintiffs' Request for Judicial Notice [ECF 77], receiving into evidence the exhibits listed therein.

**Plaintiff's Exhibits**

| No. | Description |
|---|---|
| 1. | Mover's Proof of Claim No. 7 filed in Swing House Bankruptcy Case: Bates No. 2313. |
| 2. | Mover's Proof of Claim No. 8 filed in Swing House Bankruptcy Case: Bates No. 2328. |
| 3. | Casitas Lease: Bates No. 0758-0812. |
| 4. | Casitas Certificate of Occupancy: Bates Nos. 0602-0605. |
| 5. | City of Los Angeles Memos re Zoning: Bates Nos. 0431-0601. |
| 6. | Swing House Offering Memorandum, Solicitation Package: Bates Nos. 2167-2253. |

| No. | Description |
|---|---|
| 7. | Swing House Subordinated Convertible Note dated July 23, 2014. |
| 8. | Casitas Construction Contracts with Amendments: Bates Nos. 0816-0838; 1046-1175; 2137. |
| 9. | Los Angeles Department of Building and Safety (LADBS) certificate information re: 3227 W. Casitas Ave.: Bates Nos. 0814-0815. |
| 10. | Jaurigui e-mail re construction cost: Bates Nos. 0750-0751. |
| 11. | Casitas Construction Management Contracts: Bates Nos. 0752-0757. |
| 12. | Declaration Pages from Swing House's insurance policies re use as recording studio; Swing House: Bates Nos. 2725-2754. [2] |
| 13. | Swing House Advertisement re Recording Studio: Bates No. 2500. |
| 14. | Swing House D'Addario Convertible Note dated July 7, 2014: Bates Nos. 2638-2664. |
| 15. | Omitted/Skipped |
| 16. | Swing House, Minutes of Board of Directors, April 8, 2015: Bates Nos. 2509-2510. |
| 17. | Swing House, Minutes of Board of Directors, May 20, 2015: Bates No. 2511. |
| 18. | Swing House, Minutes of Board of Directors, June 1, 2015: Bates No. 2512. |
| 19. | Swing House, Minutes of Board of Directors, December 14, 2014: Bates No. 2513. |
| 20. | 7175 WB/Swing House Lease: Bates Nos. 1235-1265. |
| 21. | 7175 WB Permit Plan re sound stage: Bates Nos. 0917-0939. |
| 22. | Eve Steele demand e-mail September 2014: Bates Nos. 0885-0889. |

[2] The Bates numbers listed for Exhibit 12 are taken from Plaintiff Swing House's proposed findings of fact and conclusions of law, but the court cannot verify the accuracy of such numbering because there are no Bates numbers on the court's copy of the exhibits.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

| No. | Description |
|-----|-------------|
| 23. | 7175 WB's 3-Day Notice: Bates Nos. 1176-1181. |
| 24. | 7175 WB's Summons and Complaint for Unlawful Detainer: Bates No. 1182. |
| 25. | Certificate of Occupancy-Willoughby: Bates Nos. 1266-1267. |
| 26. | Artist Contracts for Jared and The Tender Box: Bates Nos. 1866-1898; 1912-1984. |
| 27. | Artist Contracts and Related Material for Jared and The Tender Box: Bates Nos. 1866-1877; 2080-2090. |
| 28. | Kobalt Reports: Bates Nos. 0861-0883; 1994-1999; 2006-2009, |
| 29. | Jaurigui e-mail re Kobalt: Bates No. 2081. |
| 30. | Jaurigui e-mail re recording studio: Bates Nos. 0633-0634. |
| 31. | Jaurigui e-mail re recording studio: Bates Nos. 0748-0749. |
| 32. | Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 5, 2018. |
| 33. | Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 26, 2018. |
| 34. | Silent Music Box Kobalt Statements 2020: Bates Nos. 3511-3526. |
| 35. | Melanie Barker e-mail re Kobalt Silent Music Box, Master Sync Payment: Bates Nos. 3518-3522. |
| 36. | June 12, 2018 e-mails re Sunset Strip Music Festival event: Bates Nos. 3523-3526. |
| 37. | Jaurigui Expenses 2017-2018: Bates No. 3683. |
| 38. | Swing House Income by Customer Summary, January 2009 to December 2020: Bates Nos. 3527-3650. |
| 39. | Jared Tour Dates Printout: Bates Nos. 3651-3682. |
| 40. | Rentals Event Quarterly Reports 2013-2018: Bates No. 3699. |

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

| No. | Description |
|---|---|
| 41. | Swing House Profit & Loss Statements for 2017 and 2018 and Income by Customer Summaries for January 2009 to December 2015: Bates Nos. 3700-3799. |
| 42. | E-mails re Sunset Strip Music Festival Event: Bates Nos. 3800-3820. |
| 43. | Swing House Ledger Printout for Sunset Strip Music Festival: Bates Nos. 3802-3820. |
| 44. | Jaurigui e-mail dated July 17, 2013: Bates Nos. 3820-3827. |
| 45. | Swing House Note to Jaurigui dated July 3, 2014. |
| 46. | Swing House e-mails: Bates Nos. 1403-1416; 2725-2751. |
| 47. | E-mails advising Jaurigui re construction: Bates Nos. 2501-2504; 2740-2744. |
| 48. | E-mails re Knitting Factory and Invoice re DLBA:  Bates Nos. 3381-3390. |
| 49. | E-mails re East of Eli commission:  Bates Nos. 2668-2681. |

**Defendant's Exhibits**

| No. | Description |
|---|---|
| A. | Deposition Transcript of Jonathan Mover January 31, 2020. |
| B. | Deposition Transcript of Genoveva Winsen January 29, 2020. |
| C. | Email Dated 11/7/2014 Melman to Benjamin Kacev: Bates No. 009000. |
| D. | Email Dated 9/1/2016 from Mover to S. Ahmed: Bates No. 009002. |
| E | Email chain dated 9/6/2018: Bates Nos. 009003-009012. |
| F. | Corrected Form 2017 1099 MISC: Bates Nos. 009024-009025. |
| G. | Email Dated 9/7/2018 from Eduardo Vivas to Jaurigui: Bates Nos. 009026-009031. |
| H. | Email Dated 2/6/2014 from J. Mover to Jaurigui: Bates Nos. 009032-009033. |
| I. | Martin McNair Letter Dated 5/30/2001: Bates No. 1079. |
| J. | Plaintiff's Designated Exhibits. |

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

| K. | Certificate of Occupancy for 3229 W Casitas Ave 90039:  Bates No. 0602. |
| L. | Offering Memorandum, Solicitation Package: Bates Nos. 2218-2313 |
| M. | E-mail exchange Jaurigui and Eve Steele Dated 8/24/14: Bates Nos. 0884-0888. |
| N. | Tender Box Recording Expenses Ledger: Bates Nos. 2006-2009 |
| O. | Swing House Rehearsal & Recording, Inc., Transaction Report: Bates Nos. 2665-2666. |
| P. | Willoughby Lease: Bates Nos. 1235-2666. |

**Documents Subject to Judicial Notice**

| 50 | Debtor Philip J. Jaurigui's Bankruptcy Schedules and Statement of Financial Affairs, Chapter 7 Case, ECF 17 in Jaurigui Bankruptcy Case, No. 2:16-bk-24760-RK. |
| 51 | Debtor Philip J. Jaurigui's Amended Schedules, ECF 21 in Jaurigui Bankruptcy Case, No. 2:16-bk-24760-RK. |
| 52 | Debtor Philip J. Jaurigui's Statement of Financial Affairs, ECF 41 in Jaurigui Bankruptcy Case, No. 2:16-bk-24760-RK. |
| 53 | Swing House Rehearsal and Recording, Inc.'s Bankruptcy Schedules, ECF 41 in Swing House Bankruptcy Case, No. 2:16-bk-24758 |
| 54 | Swing House's Statement of Financial Affairs, ECF 41 in Swing House Bankruptcy Case, No. 2:16-bk-24758. |
| 55 | Fourth Amended Plan of Reorganization dated April 16, 2018, for Swing House, ECF 354 in Swing House Bankruptcy Case, No. 2:16-bk-24758. |
| 56 | Order Confirming Fourth Amended Plan of Reorganization Dated April 16, 2018, ECF 594 in Swing House Bankruptcy Case, No. 2:16-bk-24758. |

The court hereby issues the following findings of fact and conclusions of law after considering the evidence received at trial[3] and the other papers and pleadings relating to this adversary proceeding pursuant to Federal Rule of Civil Procedure 52, made applicable here by the Federal Rule of Bankruptcy Procedure 7052.

## II.    FINDINGS OF FACT

1.    Jaurigui filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C., in this Bankruptcy Court on November 8, 2016.  Jaurigui's Chapter 11 bankruptcy case was converted to one under Chapter 7 of the Bankruptcy Code on July 12, 2018.  Joint Pre-Trial Statement ("JPTS")[4], ECF 55, ¶ E.

2.    Jaurigui in his trial testimony acknowledged that he read and signed his bankruptcy petition, schedules, and statements under penalty of perjury.  Tr. at 79:14-15 (Jaurigui Testimony, Sept. 27, 2021).

3.    Swing House is and all times relevant hereto is a California corporation.  JPTS ¶ A.

4.    Swing House is one of Jaurigui's creditors.  JPTS ¶ C.

5.    Swing House filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C., in this Bankruptcy Court on November 8, 2016.  JPTS ¶ D; Swing House's Bankruptcy Petition, Case No. 2:16-bk-24758-RK Chapter 11, ECF 1.

---

[3] The court has reviewed the proposed findings of fact and conclusions of law from the parties, and based on its independent review of these proposed findings of fact and conclusions of law and the evidence received during trial, and consideration of the written and oral arguments of the parties, and further deliberations after closing arguments, the court is adopting many of the proposed findings of fact and conclusions of law of Plaintiff Swing House, which better reflects the evidence in the record and better addresses the issues raised by Plaintiff Swing House than Defendant Jaurigui's, though the court has made substantial modifications and corrections to the record cited in Plaintiff Swing House's proposed findings of fact and conclusions of law.  The court also adopts references to the Transcript submitted by Plaintiff Swing House in the Declaration of Janis G. Abrams, ECF 105, filed on March 28, 2022, which are noted as "Tr."  The declaration of Ms. Abrams, who is one of Plaintiff Swing House's attorneys, sets forth accurate summaries of the trial testimony, including many verbatim quotations from the trial testimony.

[4] Throughout these Findings of Fact and Conclusions of Law, references will be made to the Joint Pretrial Stipulation ("JPTS") [ECF 56], the trial declarations of Jonathan Mover ("Mover") [ECF 69], Alan Friedman ("Friedman") [ECF 70], Genoveva Winsen ("Winsen") [ECF 71], Philip J. Jaurigui ("Jaurigui") [ECF 72], and Jared James Nichols ("Jared" or "Nichols") [ECF 73].

6.      Jaurigui was the founder of Swing House, its president, majority shareholder, member of its board of directors and its driving force from 1993 until he resigned in June 2018, following the confirmation hearing of the Fourth Amended Plan of Reorganization in Swing House's Chapter 11 bankruptcy case. JPTS ¶ F, O.

7.      Jaurigui assisted in the preparation of Swing House's Chapter 11 Bankruptcy Petition and Schedules and executed each of them under the penalty of perjury on Swing House's behalf.  Tr. at 79:8-12 (Jaurigui Testimony, Sept. 27, 2021).

8.      Mover is an individual and a Swing House shareholder.  JPTS ¶ B.

9.      For more than 40 years, Mover has had a successful career as a professional musician, primarily as a drummer, producer, engineer, and composer.  Mover also co-owned and then solely owned and operated a recording studio known as Alien Flyers and thereafter known as Skyline Digital or Skyline Recording Studios NYC, hosting a variety of artists.  In 2006, Mover co-founded Drumhead Magazine and in 2014 became its sole owner, Managing Member and Editor-in-Chief.  Mover Dec. ¶ 8.

10.      Mover and Jaurigui met in 2013, introduced by a mutual business acquaintance, after which Jaurigui pursued Mover as an investor and/or lender to Swing House.  JPTS ¶ T.

11.      D'Addario & Co., Inc. ("D'Addario Co.") is a privately held company and manufacturer of musical instrument strings and accessories that is headquartered in New York. James ("Jim") D'Addario is its president.  JPTS, ¶ JJ; Jaurigui Dec. ¶ 44; Mover Dec. ¶ 25.  In 2013, Jaurigui had worked with D'Addario Co., for nearly 9 years as an independent contractor and a co-tenant when he approached it about investing in Swing House.  Jaurigui Dec. ¶¶ 44-45.

12.      Mover relocated to Los Angeles from the East Coast in November 2015 to co-manage Swing House with Jaurigui at D'Addario Co.'s insistence.  Mover Dec. ¶¶ 35-36.

13.      Mover is one of Jaurigui's creditors because Jaurigui and Swing House borrowed $150,000 from Mover on July 23, 2014.  Mover's Proof of Claim, Exhibit 1; Subordinated Convertible Promissory Note, Exhibit 7; Mover Dec. ¶ 13.

14.    Mover is also one of Jaurigui's creditors because Swing House borrowed $50,000 from Mover on September 8, 2014, for which Jaurigui executed a Personal Guarantee. Mover Dec. ¶ 42; Mover's Proof of Claim No. 8, Exhibit 2 at 4-5.

15.    Mover's Fourth Amended Plan of Reorganization in Swing House's Chapter 11 bankruptcy case was confirmed by the court over Swing House's objection on November 2, 2018 when the court entered the Order Confirming Fourth Amended Plan of Reorganization on November 2, 2018 in Case No. 2:16-24758-RK, ECF 594, Order Confirming Fourth Amended Plan of Reorganization Dated April 16, 2018 entered November 2, 2018, Exhibit 56. [5]

16.    The Effective Date of Swing House's confirmed Chapter 11 Plan of Reorganization was November 19, 2018.  Case No. 2:16-24758-RK, ECF 594, Order Confirming Fourth Amended Plan of Reorganization Dated April 16, 2018 entered November 2, 2018 at 12:3-5, Exhibit 56.

17.    Jaurigui was ousted as president of Swing House and his shares in Swing House were canceled pursuant to the order confirming the Fourth Amended Plan of Reorganization in Swing House's Chapter 11 bankruptcy case.  Order Confirming Fourth Amended Plan of Reorganization Dated April 16, 2018 entered November 2, 2018, ECF 594 in Case No. 2:16-24758-RK, Exhibit 56.

18.    Mover became the co-CEO of Swing House in 2015 and its CEO in June 2018 and has been the Chair of the Board of Directors of Swing House since the Effective Date of the Plan, November 19, 2018.  Mover Dec. ¶ 6.

19.    Genoveva Winsen ("Winsen") has been Swing House's Chief Financial Officer ("CFO") since 2015 and is a Custodian of Records for Swing House.  Declaration of Genoveva Winsen ("Winsen Dec."), ECF 72, ¶¶ 2-4.

20.     Winsen has been in the music industry for more than 20 years as a recording engineer, a music producer, a recording studio owner, a construction consultant, and a financial

---

[5] Exhibit 56 is one of the exhibits that Plaintiff Swing House requested the court to take judicial notice of as previously stated.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

and administrative manager of Drumhead Magazine, a drum and percussion instrument

magazine. Winsen Dec. ¶¶ 5-6.

21.    Swing House provides comprehensive rehearsal sound stage and engineering

services, live production events and rental services for the music industry.  Swing House's

Confidential Private Offering Memorandum ("Offering Memorandum") dated February 17,

2014, Exhibit 6 at 61-62; Winsen Dec. ¶ 8.

22.    Swing House in its Offering Memorandum represented that Swing House

engaged in artists' development by investing in talent by, for example, paying expenses for

making recordings and touring and providing rehearsal space. Offering Memorandum, Exhibit

6 at 8 (Artists Management Revenue and Expenses for year ending 2013); Exhibit 6 at 10

(Artists Management Revenue and Expenses for year ending 2012); and Exhibit 6 at 61

(Description of Services Offered); *see also,* Winsen Dec. ¶ 9.

23.    Exhibit 6 at 1 is the e-mail from Jaurigui on behalf of Swing House to Mover and

his accountant, Friedman, dated February 19, 2014, transmitting the Offering Memorandum to

them.  Tr. 53:18 (Jaurigui Testimony, Sept. 17, 2021).  Jaurigui's signature block on this Swing

House e-mail of February 19, 2014 that he used from at least February 19, 2014 and for a

period of years was:

> *Phil Jaurigui-President Swing House,*
> *Artist Management/Event Production/A&R*
> *cell: 323-819-4895,*
> *www.swinghouse.com*

Exhibit 6 at 1; Tr. 53:12 and 53:21 (Jaurigui Testimony, Sept. 17, 2021).

24.    Jaurigui in his trial testimony stated that he intended his signature block to

encompass "everything" he did professionally at the time and that it was up to the recipient to

determine whether he sent an email as Swing House's principal, or on his own, based on a

recipient's "best bet" to figure out whether Jaurigui was communicating on behalf of Swing House

or in his personal capacity, based on the e-mail's content.  Tr. 53:26-54:5 (Jaurigui Testimony,

Sept. 17, 2021).

25.     Jaurigui used Swing House e-mail for his non-Swing House related business.  Tr. 53-10-21 (Jaurigui Testimony, Sept. 17, 2021).

26.     Jaurigui did Artist Management work personally, but also worked for Swing House. Tr. 53:14 (Jaurigui Testimony, Sept. 17, 2021).

27.     Jaurigui's opinion of the definition of Artist Management is someone who helps guide the career of an artist, a manager or consultant.  Tr. 54:15 (Jaurigui Testimony, Sept. 17, 2021).

28.     "A&R" stands for "Artist Relations" or "Artist Repertoire."  Tr. 53:16 (Jaurigui Testimony, Sept. 17, 2021).

29.     Swing House provides artist' management services.  JPTS ¶ N.

30.     Jaurigui in his trial testimony stated that he did A&R work, but that Swing House did not do a lot of A&R work, perhaps by people other than himself.  Tr. 53:15-17 (Jaurigui Testimony, Sept. 17, 2021).

31.     According to Jaurigui, he personally managed the band, The Tender Box, as his, not Swing House's, artist.  Jaurigui Dec. ¶¶ 91, 93.  Jaurigui allowed The Tender Box to incur expenses to Swing House for the recording of its music.  Jaurigui Dec. ¶ 92; Tr. at 58:4-8 (Jaurigui Testimony, September 17, 2021).  According to Jaurigui, The Tender Box agreed to repay the expenses owed to Swing House, using the royalties collected by Kobalt, plus a 10 percent administrative fee for administering the funds collected to pay the artists, producers, songwriters and Jaurigui as the manager.  Jaurigui Dec. ¶¶ 91-96; Tr. at 58:5-6 (Jaurigui Testimony, September 17, 2021).  In response to a question to Jaurigui on cross-examination whether Swing House has contractual rights to any monies emanating from the work of The Tender Box for paying its expenses, Jaurigui responded that Swing House is owed money for expenses on recording and rehearsal if there were any, but he stated that he did not think that there was any outstanding expense.  Tr. at 58:5-8 (Jaurigui Testimony, September 17, 2021); *see also,* Exhibit N, Tender Box Recording Expenses Ledger.  Jaurigui was then asked whether, based on his testimony, it was a fair statement that he was using Swing House's resources for his personal gain, and he responded no. Tr. at 58:8-9 (Jaurigui Testimony, September 17, 2021).   Despite Jaurigui's denial that he may

have been using Swing House's resources for his personal gain in allowing his personally managed

clients like The Tender Box and Jared by having Swing House advance their expenses, the court

finds Jaurigui's testimony about the agreement between him, The Tender Box and Swing House to

be credible.  As discussed below, Swing House recouped its expenses advanced to The Tender Box

as shown on its ledger of such expenses.  *See, e.g.,* Exhibit N, Tender Box Recording Expenses

Ledger.

32.    As to the guitarist, Jared James Nichols, Jaurigui as Jared's manager allowed Jared

use of Swing House's rehearsal and recording studios during off hours, even though Jared was

Jaurigui's personal client, and in exchange Jared worked at Swing House performing odd jobs

which was credited against his rehearsal and recording expenses.  Jaurigui Dec. ¶ 75; Tr. at 59:3-9,

61:21-27 (Jaurigui Testimony, September 17, 2021).  This agreement was not in writing and was

between Jared, Jaurigui in his personal capacity and Jaurigui as president of Swing House.  Tr. at

61:25-62:1 (Jaurigui Testimony, September 17, 2021).  Jaurigui did not provide supporting

documentation showing the hours that Jared worked at Swing House.  Tr. at 57:10 -25, 62:2-22

(Jaurigui Testimony, September 17, 2021).  Despite Jaurigui's denial that he may have been using

Swing House's resources for his personal gain in allowing his personally managed clients like The

Tender Box and Jared by having Swing House advance their expenses, the court finds Jaurigui's

testimony about the agreement between him, the court finds Jaurigui's testimony about the

agreement between him, Jared and Swing House to be credible.  As discussed below, Swing House

recouped some, if not all, of its expenses advanced to Jared.  *See, e.g.,* Declaration of Jared James

Nichols (describing his barter for use of Swing House rehearsal facilities by doing odd jobs).

33.    Swing House's Offering Memorandum stated that Swing House provides A&R

Services.  Exhibit 6 at 61.  The profit and loss statement for Swing House for 2013 in the Offering

Memorandum indicated income from artist management fees and artist management expenses for

artists, including Jared James Nichols and The Tender Box. Exhibit 6 at 8-9.  Pro forma profit and

loss statements for Swing House for November 2013 through October 2016 also indicated income

from artist management fees and artist management expenses for artists, including Jared James

Nichols. Exhibit 6 at 18-26.  Jaurigui in his trial testimony admitted that the listings of artist

management fee income and expenses for Jared James Nichols on these financial statements were

in error because he, not Swing House, was personally managing Jared James Nichols.  Tr. at 55:17

- 56:19, 59:3-9 (Jaurigui Testimony, September 17, 2021).  Jaurigui acknowledged that listing artist

management fee income and expenses for Jared and The Tender Box was "possibly a mistake," but

denied that it was "okay" to make misrepresentations in the Offering Memorandum.  Tr. at 62:27

(Jaurigui Testimony, Sept. 17, 2021).  In his trial testimony, Jaurigui denied that the only reason

why artist management fee income and expenses for Jared and The Tender Box were in Swing

House's Offering Memorandum was because Swing House had contractual rights in their music

and performances and because he did not want to misrepresent the status of Swing House's rights

in Jared and The Tender Box.  Tr. at 62:24-27 (Jaurigui Testimony, Sept. 17, 2021).  Because the

court finds Jaurigui's testimony about the agreements between him, The Tender Box, Jared and

Swing House to be credible, the court finds that Swing House generally did not have contractual

rights in their music and performances other than in specific written contracts between them

offered into evidence as discussed herein.

34.    In 2013, Swing House was located at 7175 Willoughby Avenue in West

Hollywood, California ("Willoughby").  JPTS ¶ Q.  In 2001, Jaurigui moved Swing House to

Willoughby, and Swing House signed a six-year lease for Willoughby, which was extended

through August 31, 2013.  *Id.;* Jaurigui Dec. ¶¶ 12-13.  According to Jaurigui, when Swing House

moved into Willoughby, it needed to be completely remodeled to convert it from a

manufacturing/warehouse facility to a facility that could be used for music rehearsal and recording.

Jaurigui Dec. ¶ 14.

35.    After Swing House obtained the building permits for the construction work at

Willoughby, Jaurigui consulted with the contractor and architect who helped with the design

concepts as well as the inspectors at the Los Angeles Department of Building and Safety (LADBS)

in order to determine which type of permit allowed for the broadest use of the Willoughby location,

and Jaurigui was informed that a "sound score production" permit would allow Swing House to

hold rehearsal and recording sessions for film, television and internet.  Jaurigui Dec. ¶ 17.

36.     After Swing House obtained the building permit from the Los Angeles Department of Building and Safety for Willoughby, Jaurigui estimated that approximately 70% of Swing House's business was rehearsals and the remaining 30% was a combination of equipment rental and recording.  Jaurigui Dec. ¶ 18.

37.     After operating Swing House at Willoughby for approximately 12 years, in 2013, Jaurigui decided it was wise to expand the business and find a new location because the existing lease was expiring and the new landlord indicated an intention to raise the rent by more than 50 percent.  JPTS ¶ S; Jaurigui Dec. ¶ 20.

38.     Jaurigui found a new location for Swing House in approximately January 2014 at 3229 Casitas Ave., Los Angeles, CA  90039 ("Casitas").  Jaurigui Dec. ¶ 21.

39.     On February 11, 2014, Jaurigui executed a lease on Swing House's behalf to rent Casitas, which was an approximately 22,000 square foot facility.  JPTS ¶ U.

40.     The Casitas facility was zoned MR-1.  JPTS ¶ W; Casitas Certificate of Occupancy and Application for Building Permits and Certificate of Occupancy, Exhibit 4 at 2.

41.     When Jaurigui executed the lease for the Casitas facility on Swing House's behalf, he knew it was not zoned for use as a recording studio, but was zoned MR-1 for use as a warehouse.  JPTS ¶ W; Jaurigui Dec. ¶ 22.

42.     The Casitas facility required significant construction to accommodate Swing House's planned use of that property, including two full production sound stages for tour rehearsals, filming, events and showcases and two rehearsal rooms.  JPTS ¶ X; Jaurigui Dec. ¶ 22; Building Plans, Exhibit 13.

43.     The Casitas facility also had room to accommodate a recording studio, eight independent producer suites, an equipment display room and a rental and cartage department for in-house and off-site productions.  JPTS ¶ X; Building Plans, Exhibit 13.

44.     To pay for the expansion of Swing House and buildout of the Casitas facility, Jaurigui realized he needed additional resources to successfully build out the new facilities and solicited Mover, D'Addario Co. and others to invest and/or lend money to Swing House though its private offering of common stock and convertible promissory notes as described in

the Offering Memorandum transmitted by Jaurigui to them.  JPTS ¶¶ S, T, X, Y; Jaurigui Dec.
¶ 34; Tr. at 54:21-26 (Jaurigui Testimony, Sept. 17, 2021); Offering Memorandum, Exhibit 6.

45.    Swing House in its Offering Memorandum given by Jaurigui to Mover and
Jaurigui orally represented to Mover that Swing House was a recording studio. JPTS ¶ GG;
Offering Memorandum, Exhibit 6 at 18, 21, 24, 52, 60, 61, 64, 67 and 69; Mover Dec. at ¶¶ 9,
11 and 26; Winsen Dec. at ¶ 19.  Jaurigui acknowledged in his trial testimony that the Offering
Memorandum represents that Swing House is operating a recording studio and did not use the
phrase, "sound stage production facility (SSPF)." Tr. at 53:8, 56:20-27 (Jaurigui Testimony,
Sept. 17, 2021).

46.    Jaurigui in his trial testimony acknowledged that he was the person in charge of
Swing House as its president and CEO at the time Swing House's Offering Memorandum
(titled "Confidential Private Offering Memorandum" dated February 17, 2014, Exhibit 6 at 53)
was prepared, was part of the process of preparing the Offering Memorandum and "definitely
contributed" to it, and did his best to make sure that the information contained in the Offering
Memorandum was accurate and up to date, understanding that it was important that it be
accurate because persons reading it would be relying on the information contained in it.  Tr.
54:21-55:8 (Jaurigui Testimony, Sept. 17, 2021).

47.    On or about February 19, 2014, Jaurigui sent Swing House's Offering
Memorandum, past financial statements, financial projections, loan documents and other
documents that are included in Exhibit 6, pages 1-87, to Mover and Friedman by e-mail. Email
transmitting Offering Memorandum, Exhibit 26 at 1; JPTS ¶ EE; Tr. at 9:11-12 (Mover
Testimony, Aug. 19, 2021).  E-mail correspondence between Jaurigui and Mover and
Friedman and Offering Memorandum, Exhibit 6 at pages 1-87; Jaurigui Dec. ¶ 43.

48.    In his trial testimony, Jaurigui stated that he did not have an understanding that
if information or facts changed after he transmitted the Offering Memorandum to potential
investors, he and/or Swing House had any obligation to update the information to potential
investors, saying that he only gave it to two potential investors, D'Addario Co. and Mover.  Tr.
55:9-17 (Jaurigui Testimony, Sept. 17, 2021).

49.     On or about February 19, 2014, Jaurigui and Swing House made material representations in Swing House's Offering Memorandum about Swing House's operating a recording studio at the Casitas facility to Mover because it:

a.     Incorporated a proposed floor plan for the Casitas location that shows space for a Recording Live Room and Control Room.  Offering Memorandum, Exhibit 6 at 2;

b.     Included an advertisement flyer that described Swing House as a "recording facility." JPTS ¶ GG; Offering Memorandum, Exhibit 6 at 52, 60, 61, 64, 67 and 69;

c.     Represented that Swing House leases space for rehearsal space and recording studio operations.  Offering Memorandum, Exhibit 6 at 67;

d.     Represented that Swing House operates a recording studio at its then current location at 7175 Willoughby, Los Angeles, California.  Offering Memorandum, Exhibit 6 at 52, 60, 61, 67 and 69.

e.     Swing House's *pro forma* profit and loss statements which were included as part of the Offering Memorandum, Offering Memorandum, Exhibit 6 at 18, 21, 24, provided line items for recording revenue and expenses; and

f.     Represented that Swing House was building a recording studio at the Casitas facility when it included line items for Recording Studio Sound Proofing in the sum of $20,000 and Recording Studio, including wiring in the sum of $25,000 in the 12-Month Cash Flow Forecast, Offering Memorandum, Exhibit 6 at 27.

*See also,* Tr. at 56:22-57:5 (Jaurigui Testimony, September 17, 2021).

50.     In 2014, Jaurigui represented to Jim D'Addario and D'Addario Co. that Swing House leases space for rehearsal space and recording studio operations.  JPTS ¶ LL.

51.     The Application for Building Permit and Certificate of Occupancy for 3229 Casitas applied for on April 1, 2015 and issued on May 27, 2014 was to change the property's existing use of Warehouse and Manufacturing to a proposed use of Sound Score Production. Casitas Certificate of Occupancy and Application for Building Permits and Certificate of Occupancy, Exhibit 4 at 3, Items 7-8.

52.     In Jaurigui's trial declaration, he explained his thinking for Swing House applying for a "sound score production" permit for Casitas: "Given my experience with the permitting process at [the] Willoughby location, the advice of the architects, the LADBS inspectors and the advice of the contractors building out the Casitas location SH [i.e., Swing House] opted to obtain a 'sound score production' permit like at the Willoughby location because it would permit SH to offer the broadest spectrum of services to its rehearsal and recording customers." Jaurigui Dec. ¶ 33.[6]

53.     With respect to Willoughby, Jaurigui explained in his trial declaration: "When we obtained building permits for the Willoughby location, I consulted with the contractor and architect that helped with the design concepts, as well as the inspectors at LADBS in order to determine which type of permit allowed for the broadest use of the Willoughby location and I was informed that a 'sound score production' permit would allow SH to hold rehearsal and recording sessions for film, TV and internet." Jaurigui Dec. ¶ 17; *see also,* Tr. at 52:25 – 53:8 (Jaurigui Testimony, September 17, 2021).  However, as noted above, Jaurigui knew that Casitas was not zoned for use as a recording studio and was zoned MR-1 for use as a warehouse.  JPTS ¶ W.

54.     Casitas's MR-1 Zoning is called "Restricted Industrial Zone" by the City of Los Angeles Zoning Department of City Planning.  City of Los Angeles, Memoranda re Zoning, Exhibit 5 at 7.

55.     Sound score production is an allowed use under Casitas's MR-1 Zoning, Exhibit 5 at 5-11, and under Zone C2 Commercial Zone, City of Los Angeles, Memoranda re: Zoning, Exhibit 5 at 19-31.

56.     Recording studio is not listed as an allowed use under Casitas's MR-1 Zoning in the City of Los Angeles.  City of Los Angeles, Memoranda re Zoning, Exhibit 5 at pages 7 through 14.

---

[6] This testimony was offered and received for a non-hearsay purpose regarding Jaurigui's state of mind.

57.     Recording studio is listed as an allowed use under C2 Zoning in the City of Los Angeles.  City of Los Angeles, Memoranda re Zoning, Exhibit 5 at 19-28.

58.     The Certificate of Occupancy for Swing House's Willoughby location was for Sound Score Production.  Willoughby Certificate of Occupancy, Exhibit 25.

59.     Swing House's property insurance declarations issued by its insurance carrier stated that Swing House was a recording studio from at least 2004 to 2017.  Declaration Pages from Swing House's insurance policies re use as recording studio, Exhibit 12; *see also,* Winsen Dec. ¶ 12.  Apparently, this designation was made based on Swing House's representations to the carrier.  *Id.*

60.      Jaurigui represented to a potential client that Swing House was a recording studio as shown by an email in 2016 that Swing House was a recording studio and that the new studio would be available in Spring 2017.  Jaurigui e-mail re recording studio, Exhibit 30; *see also,* Winsen Dec. at ¶ 19.

61.     Jaurigui represented to Mover that Swing House operated a recording studio at 7175 Willoughby Avenue, Los Angeles, California, and would be building and operating a recording studio at Swing House's new location at the Casitas premises.  Mover Dec. ¶¶ 9-11, 19-24; Tr. at 8:24-25, 9:9-20 (Mover Testimony, Aug. 19, 2021); Offering Memorandum, Exhibit 6.  Jaurigui concealed from Mover that Swing House was not legally zoned to operate a recording studio at Casitas because it was zoned MR-1.  Mover Dec. ¶ 21; JPTS, ¶ W. [7]

62.     According to Jaurigui, since he founded Swing House in 1994 until he left in 2018, he had every interest that Swing House be a successful rehearsal and recording company "as it always was."  Jaurigui Dec. ¶ 22.  Many artists recorded music at Swing House over the

---

[7] Mover's testimony and Swing House's proposed findings of fact are not very precise about when Jaurigui made the oral representations to him that Swing House operated a recording studio, except during Mover's first visit to Swing House's Willoughby location in 2013.  Mover's rather generalized testimony about oral representations by Jaurigui that Swing House operated a recording studio implies that Jaurigui constantly referred to Swing House as a recording studio since it is implicit in its name, Swing House Rehearsal and Recording, Inc., and more importantly, for Mover, his testimony is corroborated by the written representations in Swing House's Offering Memorandum that Swing House operated a recording studio which constitute Jaurigui's representations to him as such, and thus, the court generally finds Mover's testimony to be credible regarding that Jaurigui made the representations to him.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

24-year period that Jaurigui was there including world renowned artists like Shakira and

Aerosmith.  Jaurigui Dec. ¶ 23.   By Jaurigui's own estimation, Swing House's recording

studio activities was a substantial part of its business up to 30% of its business.  Jaurigui Dec. ¶

18 (stating "After obtaining our permit from the LADBS for the Willoughby location I

estimate that approximately seventy percent (70%) of our business was rehearsals and the

remaining thirty percent (30%) was a combination of equipment rental and recording.").

63.    Swing House's Offering Memorandum did not disclose that Willoughby

property's approved zoning use was for Sound Score Production, not for a Recording Studio.

Exhibit 6 at 1 through 88.

64.    The Certificate Information for 3229 W. Casitas Ave.  90039 from the Los

Angeles Department of Building and Safety (LADBS) accessed on February 12, 2019 relating

to a building permit issued on July 11, 2018 for Swing House's Casitas location listed the

primary use for the location as "(23) SOUND SCORE PRODUCTION" and contained the

following work description for the permit: "EXPAND EXISTING MAZZANINE [sic], AND

ENCLOSE EXISTING COVERED LOADING DOCK IN EXISTING SOUND SCORE

PRODUCTION FACILITY WITH NO RECORDING STUDIO".  Exhibit 9, Certificate

Information for 3229 W. Casitas Ave. 90039, Los Angeles Department of Building and Safety;

*see also,* Mover Dec. ¶ 20.

65.    Swing House's Offering Memorandum did not disclose that the Casitas property

was not approved for use as a Recording Studio but could only be used for Sound Score

Production.   Email correspondence between Jaurigui and Mover and Friedman, and Offering

Memorandum, Exhibit 6 at 1 through 88.

66.    According to Mover, Jaurigui concealed from Mover the fact that Swing House

could not legally operate a recording studio because the Casitas property was zoned MR-1.

Mover Dec. ¶¶ 21-24; Tr. at 3:9-19 (Mover Testimony, Aug. 19, 2021).  However, Mover's

contention is validated as Jaurigui knew that Casitas was not zoned for use as a recording

studio and was zoned MR-1 for use as a warehouse, and Jaurigui did not tell Mover this.  *Id.;*

JPTS ¶ W.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

67.     On or about September 8, 2014, Mover lent Swing House the sum of $50,000 for 160 days ("Bridge Loan" or "Bridge Note") based on Jaurigui's representations that Swing House required additional funding to complete the recording studio at Casitas and for which Jaurigui executed a Personal Guaranty.  Mover Dec. ¶ 42; Tr. at 3:9-12, 10:19-23 (Mover Testimony, Aug. 19, 2021); Mover's Proof of Claim No. 8 in Swing House's Chapter 11 bankruptcy case, Exhibit 2 at 4-5.

68.     On July 7, 2014, D'Addario Co. lent Swing House $500,000, and on November 12, 2014, Jim D'Addario lent Swing House $250,000.  JPTS ¶ KK.

69.     A condition of D'Addario Co.'s loan to Swing House required that Jaurigui lend to Swing House $50,000 in 2014, and Jaurigui agreed to such a condition.  JPTS ¶ LL.

70.     According to Mover, Jaurigui's loan of $50,000 to Swing House was a "material" provision to him (Mover) to lend Jaurigui and Swing House $150,000 on July 23, 2014 as Mover viewed Swing House as a "failing business" that D'Addario Co., Mover and Jaurigui were trying to "resuscitate," and that he (Mover) "wanted [Jaurigui] to have skin in the game."  Mover Dec. ¶ 33.

71.     According to Mover's accountant, Friedman, Jaurigui's Exhibit O, Swing House's Transaction Report from its general ledger for the period from January 1, 2014 to March 8, 2018, is not evidence of Jaurigui's loan to Swing House in the sum of $50,000 in 2014 because the entries on Exhibit O are journal entries and are not corroborated.  Tr. at 6:10-14 (Friedman Testimony, Aug. 19, 2021); *see also,* Friedman Dec. ¶ 10.

72.     According to Winsen, nothing in Swing House's records substantiate that Jaurigui lent or invested $50,000 to Swing House in 2014 as he promised D'Addario Co., that is, the journal entries of such loan or investment by Jaurigui on Swing House's general ledger, Jaurigui's Exhibit O, are not corroborated.  Tr. 45:2-13 (Winsen Testimony, Sept. 3, 2021); Winsen Dec. ¶ 29.

73.     Jaurigui did not demonstrate that he loaned Swing House $50,000 in 2014 based on his testimony and offering of Exhibit O as corroborative evidence.  Exhibit O; Tr. at 6:10-

14 (Friedman Testimony, Aug. 19, 2021); *see also,* Friedman Dec. ¶ 10; Tr. 45:2-13 (Winsen

Testimony, Sept. 3, 2021); Winsen Dec. ¶ 29.

74.     On or about February 19, 2014, Jaurigui transmitted to Mover Swing House's

Offering Memorandum, which represented that the construction budget for the buildout of the

Casitas Facility would be $736,500 raised through the private offering to be supplemented by a

tenant improvement allowance of $218,000, for a total construction budget of $954,500.

Offering Memorandum, Exhibit 6 at 72; Mover Dec. ¶¶ 28-29; *see also,* Winsen Dec. ¶ 20. [8]

75.     Two days before Jaurigui's transmission of Swing House's Offering

Memorandum, on February 17, 2014, Jaurigui executed the "Agreement for Construction

Management Services" dated as of February 1, 2014, which defined the construction budget as

$880,000, plus a construction management fee not to exceed $200,000, for a total budget of

$1,080,000.  Exhibit 8, Casitas Construction Contracts with Amendments, at 6, 22; Mover Dec.

¶ 28; Winsen Dec. ¶ 20.

76.     Jaurigui testified that he understood that potential lenders and investors would

be relying on Swing House's Offering Memorandum.  Tr. at 55:4-7 (Jaurigui Testimony, Sept.

17, 2021).

77.     Jaurigui was responsible for the validity of the contents of Swing House's

Offering Memorandum.  Tr. 54:20 to 55:8 (Jaurigui Testimony, Sept. 17, 2021).

---

[8] Mover in his declaration at paragraph 29 asserted that Jaurigui sent Swing House's Offering Memorandum to him pursuant to which Jaurigui as Swing House's principal represented that the budget for construction at Casitas was $765,000.  Mover Dec. ¶ 28, *citing,* Exhibit 6 at 72.  Also, the parties stipulated in the Joint Pretrial Stipulation: "In 2014, Jaurigui represented to Swing House's potential investors that total construction costs for the build-out of the Casitas facility were $765,000."  JPTS ¶ Z. However, Exhibit 6, which is Swing House's Offering Memorandum, at page 72 does not refer to a figure of $765,000, but states that funds raised in the private offering in the amount of $736,500 would be used for "Build-out of the space at new premises."  Exhibit 6 at 72.  The court could not verify the cited figure of $765,000 in Mover's declaration and the stipulated fact in the Joint Pretrial Stipulation.  In any event, Mover's assertion that the construction budget represented to him by Jaurigui in the Offering Memorandum was $765,000 and the stipulated fact that Jaurigui represented that the construction budget represented by Jaurigui stated in the stipulated fact was $765,000 appear to be incorrect because they did not take into account the footnote to the $736,500 figure for "Build-out of the space at new premises", stating: "This amount will be supplemented by a $218,000 tenant improvement allowance."  Exhibit 6 at page 72.  On the other hand, Winsen correctly stated in her trial declaration that the construction budget of $954,500 based on the $736,500 use of funds from the private offering for construction, plus the $218,000 tenant improvement allowance, was the construction budget represented in the Offering Memorandum.  Winsen Dec. ¶ 20.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

78.     Jaurigui knew that Mover would rely on the Offering Memorandum.  Tr. 55:2-16 (Jaurigui Testimony, Sept. 17, 2021).

79.     Jaurigui testified that the Offering Memorandum was accurate when he sent it to Mover and D'Addario.  Tr. 55 at 5:12-16 (Jaurigui Testimony, Sept. 17, 2021).

80.     Jaurigui's execution of the "Agreement for Construction Management Services" dated as of February 1, 2014, which defined the construction budget as $880,000, plus a construction management fee not to exceed $200,000, for a total budget of $1,080,000, made the Offering Memorandum false and misleading in representing that the construction costs were only $954,500.  *Compare* Exhibit 8, Casitas Construction Contracts with Amendments, at 6, 22, *with* Offering Memorandum, Exhibit 6 at 72 (representing cost of build-out of the space at new premises at $954,500 based on funds raised in the private offering, plus the tenant improvement allowance at the new premises).  The budget known to Jaurigui based on the execution of this contract was $1,080,000, which was $125,500 (13%) higher than the $954,500 stated in the Offering Memorandum, which he gave to Mover two days later.

81.     Jaurigui testified that he did not believe he had an obligation to update information provided to potential investors and lenders if information changed after he sent it to them, that is, D'Addario and Mover.  Tr. at 55:8-16 (Jaurigui Testimony, Sept. 17, 2021). The Offering Memorandum itself provides: "The delivery of this Memorandum does not imply that any information contained herein is correct as of any time subsequent to the date of this Memorandum.  The Company undertakes no obligation to update this Memorandum and under no circumstances should the delivery of this Memorandum create any implication that there has been no change in the affairs of the Company since the date hereof."  Offering Memorandum, Exhibit 6 at 55.  The date of the Offering Memorandum was February 17, 2014.  Exhibit 6 at 53. The date of the email from Jaurigui transmitting the Offering Memorandum to Mover was February 19, 2014.  Exhibit 6 at 1.

82.     On or about June 16, 2014, after transmission of Swing House's Offering Memorandum, but prior to Mover's $150,000 loan to Jaurigui and Swing House on July 23, 2014, Jaurigui executed a First Amendment to Agreement for Construction Management

Services ("First Amendment") stating that the construction budget was $1,225,000.  Exhibit 8, Casitas Construction Contracts with Amendments, at 2-5; *see also,* Winsen Dec. ¶ 21.  The revised $1,225,000 construction budget did not include the $200,000 for construction management services also listed in the First Amendment.  *Id.*  Thus, the total construction budget for the project as of June 16, 2014 was $1,425,000.  *Id.*  The budget known to Jaurigui before Mover made his first loan to Swing House and him based on the execution of this amended contract was $1,425,000, which was $470,500 (49%) higher than the $954,500 stated in the Offering Memorandum, which he previously gave to Mover.

83.    Mover testified in his trial declaration that Jaurigui concealed the June 16, 2014 increased construction budget from Mover.  Mover Dec. ¶ 29.  Jaurigui in his trial declaration did not address Mover's testimony on this point or in his trial testimony.  Jaurigui Dec.; Jaurigui Testimony (Sept. 17, 2021).

84.    On or about September 30, 2014, Jaurigui, on behalf of Swing House, and individually, executed a Second Amendment to Agreement for Construction Management Services Dated February 1, 2014, providing that the amount of $200,000 for construction management services in the prior versions of the contract may be exceeded and that the construction manager will be compensated $5,500 for each additional week that he remains on the project.  Exhibit 8, Casitas Construction Contracts with Amendments, at 1.

85.    Swing House's construction budgets were material facts to potential investors and lenders like Mover in making investments in or loans to Swing House and Jaurigui.  Mover Dec. ¶¶ 9-29.

86.    Swing House eventually spent more than $1,800,000 to complete the buildout of its leased premises at the Casitas location as of the receipt of the Certificate of Occupancy issued in April 2015.  Winsen Dec. ¶¶ 22-23.

87.    More than 6,000 square feet of the 22,000 square foot building was not rentable to clients as it had not been improved or completed, including an area that Jaurigui had originally designated as a "recording studio."  Winsen Dec. ¶¶ 22-23.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

88.    Jaurigui asserted in his trial declaration: "Plaintiff Mover alleges that I lied to him about the construction budget, this too is untrue.  Undoubtedly the construction was overbudget.  However, no promises or representations were ever made to Mover other than those contained in the Offering Memorandum that specifically advised him as an investor that . . . there is no assurance that we will complete the build-out of our new facilities on a timely basis or budget.  See Defendant's Exhibit 'L' Offering Memorandum."  Jaurigui Dec. ¶ 62. This assertion made by Jaurigui is problematic because by the time Mover had made the loan to Swing House and Jaurigui on or about July 23, 2014 Jaurigui knew that the construction budget was $1,425,000 as reflected in the first amended construction contract which Jaurigui signed on or about June 16, 2014 and Jaurigui did not inform Mover that the construction budget was 49% higher than the amount of $954,500 represented in the Offering Memorandum, a difference of $470,500, which amount would have been material to someone like Mover extending credit to Swing House. Offering Memorandum, Exhibit 6 at 72; Casitas First Amended Construction Contract, Exhibit 8 at 2-5.  The court observes that the latest balance sheet in Swing House's Offering Memorandum as of December 31, 2013 reflected assets of $301,074, liabilities of $13,320 and equity of $301,074.  Exhibit 6 at 6-7.  Factoring in the increased construction costs would have resulted in negative equity for Swing House based on its December 31, 2013 balance sheet.  Jaurigui's testimony does not address why he did not tell Mover what he knew before Mover made his loans to Swing House. Jaurigui's argument in his testimony that Mover knew that there was no assurance that the build-out would be timely or on budget as stated in the Offering Memorandum is beside the point as Jaurigui could have told Mover what he knew about the budget before Mover made his loans to Swing House.

89.    Jaurigui also asserted in his trial declaration: "I spoke to Mover many times after he invested in SH [i.e., Swing House] in July 2014 about the construction, the problems with the construction and the fact that the construction was overbudget."  Jaurigui Dec. ¶ 63.  This assertion by Jaurigui is problematic because he only told Mover about the increased construction budget after Mover invested in Swing House and not before Mover invested and

could not have decided based on the increased construction budget that Jaurigui knew about, but did not tell Mover.

90.     Swing House's construction budget for the Casitas leased premises included line items for "Recording Studio Soundproofing" and "Recording Studio Wiring, etc.," even though Casitas was not legally zoned for use as a recording studio.  Exhibit 6, Offering Memorandum, at 27; Winsen Dec. ¶ 23.

91.      Swing House did Event Production.  Tr. 54:12 (Jaurigui Testimony, Sept. 17, 2021).

92.     Swing House's business includes an Events Division, which plans, organizes, and manages events for third parties.  That is, Swing House hires and manages personnel to attend and stage a particular event, and procure equipment such as lighting and audio equipment.  Winsen Dec. ¶ 73.

93.     On or about February 19, 2014, Jaurigui made representations to Mover that Swing House's Event Management Division was growing because the Offering Memorandum that Jaurigui sent to Mover included:

a.     Swing House's Profit & Loss Statement for 2012 which represented revenue for Rentals & Cartage in the sum of $816,941.  Exhibit 6, Offering Memorandum, at 12;

b.     Swing House's Profit & Loss Statement for 2012 which represented Total Cost of Goods Sold in the sum of $422,274.  Exhibit 6, Offering Memorandum, at 12;

c.     Swing House's Profit & Loss Statement for 2013 which represented revenue for Rentals & Cartage in the sum of $949,080.  Exhibit 6, Offering Memorandum, at 8;

d.     Swing House's Profit & Loss Statement for 2013 which represented expenses for Cost of Goods Sold in the sum of $575,715.  Exhibit 6, Offering Memorandum, at 8;

e.     Swing House's Pro Forma Projections for the one-year period ending October 2014 which projected revenue for Rentals & Cartage in the sum of $1,161,323.  Exhibit 6, Offering Memorandum, at 18;

f.      Swing House's Pro Forma Projections for the one-year period ending October 2014 which projected expenses for Cost of Sales in the sum of $613,898.  Exhibit 6, Offering Memorandum, at 18;

g.      Swing House's Pro Forma Projections for the one-year period ending October 2015 which represented revenue for Rentals & Cartage in the sum of $1,456,388.  Exhibit 6, Offering Memorandum, at 21;

h.      Swing House's Pro Forma Projections for the one-year period ending October 2015 which projected expenses for Cost of Sales in the sum of $750,262.  Exhibit 6, Offering Memorandum, at 21;

i.      Swing House's Pro Forma Projections for the one-year period ending October 2016 which projected revenue for Rentals & Cartage in the sum of $1,820,486.  Exhibit 6, Offering Memorandum, at 24;

j.      Swing House's Pro Forma Projections for the one-year period ending October 2016 which projected expenses for Cost of Sales in the sum of $937,673.  Exhibit 6, Offering Memorandum, at 24;

k.      Swing House's representations on its revenue categories chart indicated that its Event Management Division had grown 25% year over year from 2008 to 2013.  Exhibit 6, Offering Memorandum, at 5;

l.      Swing House's representations that its Event Management Division's 2013 revenue was $949,080 and that expenses attributed to Sunset Strip Music Festival were $227,550.  Exhibit 6, Offering Memorandum, at 8;

m.      Swing House's representations that its Event Management Division 2012 revenue was $816,940 and that expenses attributed to Sunset Strip Music Festival were $32,041.  Exhibit 6, Offering Memorandum, at 12;

n.      Swing House's representations that its Event Management Division 2011 revenue was $589,326; and that expenses attributed to Sunset Strip Music Festival were $18,385.  Exhibit 6, Offering Memorandum, at 16.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

o.      Swing House's single largest client prior to February 2014 was Sunset Strip

Music Festival, revenue from which was $1,177,405 from 2009-2015, making it Swing

House's largest client and more than 350% larger than the next most financially valuable

client, Sirius.  Income by Customer Summary, Swing House Rehearsal & Recording, Inc.,

Exhibit 41 at 3; *see also,* Winsen Dec. ¶ 26.

94.      Jaurigui knew for certain as of July 3, 2014, after he transmitted Swing House's

Offering Memorandum package, but before Mover lent $150,000 to Jaurigui and Swing House

on July 23, 2014, that Swing House had lost Sunset Strip Music Festival as a client.  E-mails re

Sunset Strip Music Festival (SSMF) Event, dated June 27, 28 and July 3, 2014, Exhibit 42 at 1,

2, 20, 21; Jaurigui e-mail dated July 3, 2014, Exhibit 44.

95.      Jaurigui in his trial declaration asserted that while the Sunset Strip Music

Festival generated a lot of gross revenue, it was expensive for Swing House and the ultimate

profit was much lower than the gross and that it was a good thing for Swing House to have

been terminated because the following year, the festival failed dramatically with producers and

subvendors all going unpaid.  Jaurigui Dec. ¶ 65.  The court finds this testimony not to be

credible as there is no evidence corroborating Jaurigui's assertions that Swing House's loss of

the Sunset Strip Music Festival contract was somehow beneficial to the company or otherwise

not material for disclosure to have been made to Mover before Mover made his loans to Swing

House.

96.      Jaurigui concealed from Mover the fact that Swing House lost the Sunset Strip

Music Festival as a client before Mover lent Jaurigui and Swing House $150,000 on July 23,

2014.  Mover Decl. at ¶¶ 31-32; Tr. at 3:4-8 (Mover Testimony, August 19, 2021).

97.      Jared James Nichols ("Jared") is a musician that Jaurigui manages; Jaurigui is

and has been Jared's manager as of the time of trial, although they have not executed any

written agreements.  Tr. at 59:8-9; 64:27-65:1 (Jaurigui Testimony, Sept. 17, 2021); Tr. at

20:21-24, 22:22-23 (Nichols Testimony, Sept. 2, 2021).

98.      In 2011, Jared started bartering rehearsal time at Swing House's Willoughby

facility, and then at its Casitas facility, in exchange for performing odd jobs at Swing House

1  like helping to clean bathrooms, moving music equipment, setting up rehearsal equipment for

2  Swing House customers and "pretty much anything that was needed to operate the business."

3  Nichols Dec. ¶ 6; Jaurigui Dec. ¶ 75; Tr. at 59:3-9, 61:21-27 (Jaurigui Testimony, Sept. 17,

4  2021).

5      99.    Jaurigui also permitted Jared to rehearse at Swing House for free during the

6  company's off hours (or "downtime") and booked the time used as an expense in the hope that

7  he would pay back the expense at some point, even though Jared was Jaurigui's personal client.

8  Jaurigui Dec. ¶ 75; Tr. at 58:19-59:21 (Jaurigui Testimony, Sept. 17, 2021); Tr. at 21:2-5

9  (Nichols Testimony, Sept. 2, 2021).

10     100.   Swing House advanced expenses to Jared for his performances.  Tr. at 58:3-4,

11 61:19-22; 62:2-5 (Jaurigui Testimony, Sept. 17, 2021); Tr. at 21:2-5, 22:25 (Nichols

12 Testimony, Sept. 2, 2021).

13     101.   Jaurigui and Jared in their trial testimony acknowledged that Jaurigui authorized

14 the use of Swing House assets to advance touring expenses for Jared and his band members,

15 even though Jaurigui testified that Jared is Jaurigui's personal client.  Jaurigui Dec. ¶ 75; Tr. at

16 72:10-73:18 (Jaurigui Testimony, Sept. 27, 2021). Tr. 21:2-5 (Nichols Testimony, Sept. 2,

17 2021).

18     102.   Jaurigui in his trial testimony stated that Swing House had the right to recoup

19 expenses from Jared for expenses it advanced for him pursuant to an oral agreement between

20 Jared and Swing House.  Tr. 64:12-15 (Jaurigui Testimony, Sept. 17, 2021).

21     103.   Jared worked to repay Swing House by providing in-kind services, even though

22 Jared was Jaurigui's personal client.  Jaurigui Dec. ¶ 75; Tr. 73:20-21 (Jaurigui Testimony,

23 Sept. 17, 2021); Tr. at 21:2-5 (Nichols Testimony, Sept. 2, 2021).  According to Jaurigui, he

24 told Jared that as president of Swing House, he was happy to authorize Jared to rehearse at

25 Swing House, but Jared "[had] not made any money back, so you [Jared] gotta start chipping in

26 and doing some labor."  Tr. at 61:25-27 (Jaurigui Testimony, Sept. 17, 2021).  According to

27 Jaurigui, the relationship between Jared and Swing House was a barter transaction, that is,

28 based on their oral agreement between Jared and Jaurigui for Swing House, Jared did labor for

Swing House in exchange for rehearsal time at Swing House, and Swing House staff kept track of Jared's hours, though Swing House did not treat him as an employee. Tr. at 62:1-20 (Jaurigui Testimony, Sept. 17, 2021).

104.     Jared in his trial declaration stated: "Jaurigui has always acted as a friend and assisted me with my career decisions, however, I do not have any agreement with him regarding any aspect of my career." Nichols Dec. ¶ 20. There is no evidence of continuing management of Jared by Jaurigui as Jared manages his own affairs and his band. *See* Nichols Dec. ¶¶ 18-21; Tr. at 20:21-24, 22:24 - 22-15 (Nichols Testimony, Sept. 2, 2021).

105.     According to Jared in his trial declaration, he stopped working for and using Swing House's services in 2016. Nichols Dec. ¶ 22.

106.     Jaurigui's bankruptcy schedules do not disclose that he had managed Jared. Jaurigui's Bankruptcy Schedules and Statement of Financial Affairs, Exhibit 50 at 27: Part 1 Employment at 29: Attachment for Additional Employment Information. However, it appears to the court that there is no need for such disclosure as noted above, there is no evidence of continuing management of Jared by Jaurigui as Jared manages his own affairs and his band. *See* Nichols Dec. ¶¶ 18-21; Tr. at 20:21-24, 22:24 - 22-15 (Nichols Testimony, Sept. 2, 2021).

107.     Swing House's Offering Memorandum included its Profit and Loss Statements which recorded as income Artists' Management fees in the sum of $13,023 on its Profit and Loss Statement for 2013, Offering Memorandum, Exhibit 6 at 8; and expenses attributable to Jared in the sum of $23,258, Offering Memorandum, Exhibit 6 at 9.

108.     In Swing House's *pro forma* Profit and Loss projections, it represented Artists' Management fees of $13,380 attributable from its management of Jared for 2014-2016, Offering Memorandum, Exhibit 6 at 18, 21, and 24.

109.     In Swing House's *pro forma* Profit and Loss projections, it projected expenses for Jared of $15,675 for 2014, Offering Memorandum, Exhibit 6 at18, and of $6,000 for 2015 and 2016, Offering Memorandum, Exhibit 6 at 21 and 24.

110.     Swing House is identified as Licensor in the Agreement dated August 10, 2014 executed by Jaurigui on Swing House's behalf and Laurent Merle, trading as Listenable

Records ("Listenable Agreement").  Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 1; *see also,* Winsen Dec. ¶ 39; Tr. 22:11 (Nichols Testimony, Sept. 2, 2021).  In the Listenable Agreement, Swing House as Licensor granted an exclusive license to Listenable Records to use the Licensed Master Recordings ("Licensed Masters") of Jared in compositions on a new First Album and a First Option Album in the covered Territory defined to be enumerated countries on the continent of Europe for a term of 10 years from the commercial release of such album which will be extended for one-year periods unless terminated by either party.  Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 1-12.

111.    According to Winsen, a "Master Recording" is defined as the original audio recording in the music and recording business from which all copies are derived and is typically owned by a recording label or by another investor.  Winsen Dec. at ¶ 9.

112.    Jaurigui executed the Listenable Agreement on Swing House's behalf.  Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 1; Tr. 63:2-7 (Jaurigui Testimony, Sept. 17, 2021).

113.    Jaurigui is not a party to the Listenable Agreement in his individual capacity, which he did not deny.  Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 1-10; *see also,* Winsen Dec. ¶ 40.

114.    Jaurigui executed the Listenable Agreement on Swing House's behalf, warranting Swing House as Licensor, that "it is the owner of all right, title and interest in and to the Licensed Masters including copyrights or similar property laws recognized by law in the Territory." Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 7, ¶¶ 10(a) and 10.

115.    Jaurigui executed the Listenable Agreement on behalf of Swing House as Licensor, warranting that "Licensor's copyright interest in and to the Album, the Licensed Masters and the performances fixed therein shall be and remain the property of the Licensor. Licensor hereby expressly reserves all rights in and to the Album and the Licensed Masters not specifically granted hereunder together with any other rights not specifically granted to Licensee herein and to any income derived from the sale or other exploitation of such reserved

rights." Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 2, ¶¶ 2(d) and 10; *see also,* Winsen Dec. ¶¶ 39 and 41.

116.    According to Jared in his trial declaration, the Listenable contract to license two albums by Jared did not generate income to him as the advances that Listenable made to Jared of $4,000 for the first album and $6,000 for the second optional album under the contract went to pay expenses of his band, and he still owes Listenable for these expenses.  Nichols Dec. ¶¶ 9-14.  According to Jared, "Listenable's sales of my albums were dismal, and I understand they sold just a few thousand albums and were never able to cover all the expenses related to promoting my music." *Id.*  The court finds this testimony to be credible.  Mover's evidentiary showing that Swing House is entitled to payment of advances or income from the Listenable contract with Jared or that Swing House's rights in the contract had value according to the Winsen Declaration is not credible as there is no corroborating evidence that Jared's performance of the Listenable contract generated income or other payment due to Swing House as Jared's testimony is credible that the only money received on the contract was advances by Listenable totaling $10,000 which went to pay expenses of the band, including plane tickets for touring in Europe, and that the rights in the contract had any value. *Id.; see also,* Winsen Dec. ¶¶ 39-46, 55.   In so finding, the court notes that Swing House did not call any witness from Listenable or offer documentary evidence from Listenable to establish that Listenable made any other payments on behalf of its contract with Jared other than advancing the $10,000 to Jared and his band on the two contracted albums, which were offset against band expenses as Jared had testified. *Id.*

117.    Jaurigui executed an agreement on behalf of Swing House as the Company with Jared and Warren Huart for the services of Jared as the Artist and Warren Huart as producer to record, engineer, and mix nine master recordings of compositions entitled "Let You Go," "Can You Feel It," "Sometimes," "All Your Pain," "Get Down," "Take My Hand," "Now or Never," "Come In My Kitchen," and "Playing for Keeps" and to mix one master recording of the composition entitled "Blackfoot," dated May 1, 2013, which agreement is referred to herein as

the Warren Huart Letter Agreement. Jared Artist Contracts, Warren Huart Letter Agreement, Exhibit 26 at 46.

118. Swing House is identified as the "Company" in the Warren Huart Letter Agreement executed between Swing House by Jaurigui, Jared, and Warren Huart. Jared Artist Contracts, Warren Huart Letter Agreement, Exhibit 27 at 46.

119. Swing House was entitled to recoup costs pursuant to the Warren Huart Letter Agreement. Jared Artist Contracts, Warren Huart Letter Agreement, Jared Artist Contracts, Exhibit 26 at 47, ¶ 4; Tr. at 64:13-16, 65:23 (Jaurigui Testimony, Sept. 17, 2021).

120. The Warren Huart Letter Agreement executed by Jaurigui on Swing House's behalf warranted that "[t]he Masters and all material shall, from the inception of their creation be entirely the property of Company and Artist in perpetuity. . . ." Jared Artist Contracts, Warren Huart Letter Agreement, Exhibit 26 at 50, ¶ 9.

121. Swing House and Jared own the Master Recordings pursuant to the Warren Huart Letter Agreement, Exhibit 26 at 50, ¶ 9, which provides that "The Masters and all other material shall, from the inception of their creation, be entirely the property of Company and Artist in perpetuity throughout the universe, free of any claim whatsoever by Producer or by any third party deriving any right or interest therefrom, and upon Company's request, Producer shall executed and deliver to Company any documents which Company may reasonably require to vest in Company and Artist (and their designees, if applicable), the rights herein granted in respect of the Masters and other material mixed hereunder." *Id.;* Tr. at 65:25-27; 66:4 (Jaurigui Testimony, Sept. 17, 2021).

122. Jaurigui in his trial testimony acknowledged that Swing House is entitled to royalties for exploitation of Jared's work pursuant to Warren Huart Letter Agreement, and one other contract with Extreme Music, but no others. Tr. at 65:3-66:5 (Jaurigui Testimony, Sept. 17, 2021); *see also,* Jared Artist Contracts, Warren Huart Letter Agreement, Exhibit 26 at 48, ¶ 6(d)(iii).

123. Swing House's ownership of the Master Recordings of 10 songs of Jared pursuant to the May 1, 2013 Warren Huart Letter Agreement is not disclosed in Swing House's

bankruptcy schedules.  RJN Exhibit 53, Swing House's Schedules A/B; Property, at 8, Part 4: Investments (none); Part 10: Intangibles and Intellectual Property at 10.

124.    Swing House performed its obligations pursuant to its contracts with Jared by paying certain designated expenses for him.  JPTS ¶ OOO.

125.    According to Winsen in her trial declaration, Swing House held itself out to the recording industry as a record label in its two contracts for Jared's music with Listenable Records and Warren Huart, for example, by exploiting the recorded works of artists it developed and managed by securing  revenue generating performances and other agreements on behalf of the artists, and by overseeing  the administration of funds received under and through these agreements for fees, which Jaurigui did not deny.  Winsen Dec. ¶¶ 38, 39, 41 and 42; Jared Artist Contracts, Exhibit 26 at 47, ¶ 4, 50, ¶¶ 9 and 10, Exhibit 26 at 7, ¶ 10, and Exhibit 26 at 2, ¶ 2(d), 3, ¶ 5 and 11.

126.    According to Jared in his trial declaration, none of the contracts he had with Listenable, Extreme Music and Team Rock to promote, distribute and get his music to be heard publicly resulted in any significant source of revenue for him, that is, all of the contracts were "losers and never generated enough to pay for the expense related to distribution of my music." Nichols Dec. ¶ 9; *see also,* Jaurigui Dec. ¶¶ 79-80 ("The contract with Extreme is a blanket licensing agreement of three songs to Extreme a company that puts background music on television shows and video games . . . [and] was a bitter disappointment and 8 years later none of the songs placed in a television show or video game helped generate larger public interest or income.  No money is owed SH and never was . . ."), ¶ 83 ("The license with Team Rock yielded $0.00."), ¶¶ 84-90 ("Again, the Listenable contract proved to be without any financial success for SH or Jared and the producers and engineers of the music on those 2 albums are still owed for their services.").  Mover offered no credible evidence to rebut Jared's and Jaurigui's testimony that Jared's contracts were losers, such as offering testimony from authorized representatives of Listenable, Extreme Music or Team Rock.

127.    According to Jaurigui in his trial declaration, Jared has not achieved monetary success in his professional music career as all of the contracts that Jared entered into have proven to be failures and that all of the music that Jared has written and licensed has been proven to be without mainstream popularity.   Jaurigui Dec. ¶ 76.

128.    According to Winsen's opinion testimony in her trial declaration, Swing House is entitled to total funds not received relating to its contracts relating to Jared's music, which includes: (1) $6,000 second album advance on the Listenable Records contract; (2) 16% of the suggested wholesale price of a first album for physical sales under the Listenable Records contract; (3) 17% of the suggested wholesale price of the second (or first option) album for physical sales under the Listenable Records contract; (4) 25% for actual amounts received for digital sales of Jared's music; (5) 25% of gross receipts on account of the Extreme Music license; and (6) 100% of all monies from the exploitation of the master recordings of Jared's music that Swing House owns exclusive rights, which Jared, Jaurigui or Old Glory Music, Jared's music company, received instead of Swing House.  The evidentiary showing in support of these claims of Swing House in Jared's music based on the Winsen Declaration is not credible as there is no corroborating evidence that Jared's performance under the various contracts in Exhibit 26 generated income or other payment due to Swing House as Jared's testimony is credible that the contracts were "losers" in Jared's words and never generated enough revenue to pay for the expenses of distribution of his music.  Winsen Dec. ¶¶ 39-55; Nichols Dec. ¶¶ 7-19.  In so finding, the court notes that Swing House did not call any witness from Listenable, Extreme Music, Team Rock or Warren Huart or offer documentary evidence from these entities to establish that the revenues, if any, generated from Jared's music on their contracts with Jared and Swing House were sufficient to cover the expenses incurred to distribute his music.

129.    The Tender Box was an American band consisting of five members that did business as Silent Music Box.  Jaurigui Dec. ¶ 91.  The terms Silent Music Box and The Tender Box are used interchangeably throughout this document.  The Tender Box rehearsed

and recorded music at Swing House, and incurred expenses advanced by Swing House for the recording of their music.  *Id.;* Tr. at 58:4-6 (Jaurigui Testimony, September 17, 2021).  These facts are not disputed.  *See* Winsen Dec. ¶ 56. [9]

130.    The band, The Tender Box, was formed in 2006, and the band split up in 2012. Jaurigui Dec. ¶ 91.  *Id.*

131.    Jaurigui was The Tender Box's manager.  Jaurigui Dec. ¶¶ 91-93; Tr. at 76:27 (Jaurigui Testimony, Sept. 27, 2021).  According to Jaurigui, he was its manager during the time that it was together, i.e., between 2006 and 2012.  *Id.;* Tr. at 83:18-25 (Jaurigui Testimony, Sept. 27, 2021).    The court finds this testimony of Jaurigui on these points to be credible.  Based on this evidence, the court infers that Jaurigui was no longer the band's manager after it broke up in 2012.

132.    Jaurigui permitted Tender Box to rehearse at Swing House at Swing House's expense.  Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 26, 2018, Exhibit 33 at 6:3-9.

133.    Swing House performed its obligations pursuant to its contracts with The Tender Box by paying certain designated expenses for him.  JPTS ¶ OOO.

134.    The agreements between The Tender Box, Swing House and Jaurigui were that Swing House advanced the expenses of the band, Swing House was to take 50% of the royalties of the master licenses of The Tender Box recordings until Swing House recouped all of its expenses advanced on behalf of the band over the years, then the rights to the master recordings reverted to the band, Swing House received a 10% administrative fee to account for and administering funds for the band and those working with the band, the artists themselves, the songwriters, the producers and the manager, and Jaurigui was to receive a 20% management fee.  Jaurigui Dec. ¶¶ 92, 96, 101 and 103; Tr. at 84:14-25 (Jaurigui Testimony,

---

[9] According to Winsen, the band had four members while Jaurigui said that it had five members.  Jaurigui has personal knowledge of the band because he was its manager.  Winsen does not appear to have personal knowledge of the band since she only began her association and work with Swing House in October 2015, and according to Jaurigui, the band broke up in 2012.  The 2006 Kobalt Co-Publishing Agreement, which is a central document in this dispute, listed four members of the band. In his trial testimony, Jaurigui stated there were four core members, plus two members who had a shorter time period.  Tr. at 86:3-4 (Jaurigui Testimony, September 17, 2021)

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

Sept. 27, 2021).  The management fee to Jaurigui was 20% of any profit after expense of income.  Tr. at 83:19-20 (Jaurigui Testimony, Sept. 17, 2021).  According to Jaurigui, the agreements provided that Swing House was to recoup its expenses first before his management fee was to be paid and royalties to be paid to the producers.  Jaurigui Dec. ¶¶ 101 and 103.  These agreements were oral "handshake" agreements, not written.  Tr. at 83:12-13, 84:22-25 (Jaurigui Testimony, Sept. 27, 2021); *but see,* Tr. at 97:1-25 (Mover Testimony, Sept. 27, 2021) (rebuttal testimony expressing skepticism about a handshake agreement between Jaurigui and The Tender Box).

135.    According to a ledger of Swing House that kept a running total of the expenses and payments on behalf of Tender Box, Swing House's funds were used to pay The Tender Box's expenses during the time period from 2006 to 2014.  Tender Box Recording Expenses Ledger, Exhibit N; [10]  Tr. at 83:1-15, 84:7-12 (Jaurigui Testimony, Sept. 27, 2021); Jaurigui Dec. ¶¶ 91-96, 102, 103.  Swing House's Tender Box Recording Expenses ledger indicates as of June 20, 2014, the amount outstanding owed by The Tender Box for unpaid expenses to Swing House was zero.  *Id.*  Based on this evidence, the court finds that Swing House recouped its expenses that it advanced for The Tender Box pursuant to their agreement with Jaurigui.

136.    Jaurigui stated in his trial declaration that at the end of 2015, the members of The Tender Box asked Swing House to stop administering their royalties since the band had broken up three years earlier and very little money was coming in, so they wanted to administer their royalties themselves.  Jaurigui Dec. ¶ 105; Tr. at 84:9-11 (Jaurigui Testimony,

---

[10] The Tender Box Recording Expenses ledger was maintained by Swing House personnel primarily by Jaurigui and Melanie Baker, Swing House's vice-president.  Tr. at 83:1-15, 84:7-12 (Jaurigui Testimony, Sept. 17, 2021); *see also,* Jaurigui Dec. ¶ 96.  Mover refers to the ledger as a "chart."  Based on Jaurigui's testimony, the ledger or chart was maintained by Swing House as a running total of expenses incurred by Swing House on behalf of The Tender Box and payments and credits received on behalf of The Tender Box which were applied to the outstanding expenses, and in the court's view, the exhibit is more properly characterized as a ledger rather than a mere chart as a record of regularly conducted business activity of Swing House, although maintained by Jaurigui, Mover's party opponent.  The information on the ledger or chart is consistent with the oral agreement between The Tender Box, Jaurigui and Swing House that Swing House would advance expenses for the Tender Box, that Swing House would be entitled to recoup its expenses from the Kobalt royalties first before distribution to others and that Swing House would be paid a 10% fee for its administrative services, and corroborates Jaurigui's testimony that the advanced expenses and administrative fees owed to Swing House were fully paid in 2014..

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

Sept. 27, 2021). According to Jaurigui, no more money flowed through Swing House, and no new master synchs or licenses have been received since at least 2017. *Id.*

137.    At his meeting of creditors in his bankruptcy case on September 26, 2018, Jaurigui testified that he had received about $2,000 to $3,000 within the previous 12 months for royalties on account of Tender Box for the past two or three years during his Chapter 11 case.  Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 26, 2018, Exhibit 33 at 16-17. According to Jaurigui, he only received money for his management fee for The Tender Box after Swing House recouped its expenses in 2014, "2-3 times to 'now', a "[few] thousand dollars." Tr. at 84:14-21, 85:5-8 (Jaurigui Testimony, Sept. 27, 2021).

138.    On or about February 19, 2014, Jaurigui made material representations to Mover about Swing House's Artists Management Division because the Offering Memorandum that Jaurigui sent to Mover included:

a.      Swing House's Profit & Loss Statement for 2013 shows expenses for Silent Music Box of $840.00.  Offering Memorandum, Exhibit 6 at 9;

b.      Swing House's Profit & Loss Statement for 2012 shows expenses for Silent Music Box for Public Relations in the sum of $6,725.00.  Offering Memorandum, Exhibit 6 at 17; and

c.      Swing House's *pro forma* projections for 2014, 2015 and 2016 has a line item for Silent Music Box, but shows zero as expenses.  Offering Memorandum, Exhibit 6 at 18, 21 and 24.

139.    Jaurigui in his trial testimony stated that Jared and Silent Music Box/Tender Box, each listed on Swing House's Profit & Loss Statements for 2011, 2012, 2013 and pro forma projections, was each his personal client, and not Swing House's.  Tr. 58:27-59:4 (Jaurigui Testimony, Sept. 17, 2021); *see also,* Offering Memorandum, Exhibit 6 at 8-9, 17, 18, 21, and 24.

140.    On September 22, 2006, Kobalt Music Services America, Inc., and Ricardo Munoz, Jose Medina, Steven Mungarro and Carlos Gil, individually and collectively doing business as Silent Music Box executed a Co-Publishing and Exclusive Administration

Agreement ("Kobalt Co-Publishing Agreement"), between Kobalt as the Publisher and Silent
Music Box and its members as the Owner to exploit old and new musical compositions by
Silent Music Box described therein for a period of ten (10) years with options to extend in
exchange for royalties to be paid by Kobalt to Silent Music Box.  Kobalt Co-Publishing
Agreement, Exhibit 26 at 59-102; Winsen Dec. ¶ 57; *see also,* Proposed Finding of Fact No.
120, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107

141.    According to Winsen, Kobalt is a music publishing company that administers
rights that may accrue to artists, record companies or those in the music industry, by collecting
royalties from record companies, reports them, and makes royalty payments on quarterly basis.
Tr. at 24:12 (Winsen Testimony, Sept. 2, 2021).  *See also,* Proposed Finding of Fact No. 122,
Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.  According to
Jaurigui, Kobalt is a publishing company that owns a percentage of millions of songs and
places artists' music in television, film and other similar media.  Jaurigui Dec. ¶ 94.  The
understanding of the parties, Swing House through Winsen, and Jaurigui, of what Kobalt is as
described herein is consistent.

142.    The Kobalt Co-Publishing Agreement applies to the titles listed at in that
agreement, that is, 19 so-called "old" song compositions, and new song compositions to be
created by the members of the Tender Box, owned by Silent Music Box as publisher. Kobalt
Co-Publishing Agreement, Kobalt Co-Publishing Agreement, Exhibit 26 at 59, 60, 88 and 89.
The court declines to adopt Swing House's Fact No. 125 in Swing House's Proposed Findings
of Fact and Conclusions of Law, ECF 107, which does not accurately describe the applicable
song titles.

143.    The Kobalt Co-Publishing Agreement requires Kobalt to pay royalties to
Owner, Silent Music Box, Exhibit 26 at 59, for income from public performances, mechanical
rights, synchronization ("synch") and video uses, print and Black Box Funds, other income and
for cover compositions. Kobalt Co-Publishing Agreement, Exhibit 26 at 63-64, ¶ 5(a); Tr. at
24:22-24 (Winsen Testimony, Sept. 2, 2021); *see also,* Proposed Finding of Fact No. 127,
Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

144.     However, as Jaurigui in his trial declaration stated Swing House is not a signatory to the Kobalt Co-Publishing Agreement, Exhibit 26 at 59-102.  Jaurigui Dec. ¶ 95.  This is not a disputed fact as Swing House's witness, Winsen, in her trial declaration acknowledged that "SH [Swing House] is not a signatory to this agreement."  Winsen Dec. ¶¶ 57-58.

145.     According to Jaurigui in his trial declaration, "[t]he only reason that Kobalt paid money to SH [Swing House] was on account of the expenses that SH had incurred on Tender Box's behalf when they recorded their music."  Jaurigui Dec. ¶ 95.  As Jaurigui further stated in his trial declaration, "[b]etween 2006-2014 SH was paid all the proceeds collected by Kobalt to repay the expenses owed to SH and a 10% fee to account for and administer the funds to the artist, producers, songwriters and manager.  After 2014, no further monies were owed to SH for their expenses or administration."  Jaurigui Dec. ¶ 96; *see also,* Tr. at 82:22-83:5 (Jaurigui Testimony, September 17, 2021).

146.     As the court stated previously, the agreements between The Tender Box, Swing House and Jaurigui were that Swing House advanced the expenses of the band, Swing House was to take 50% of the royalties of the master licenses of The Tender Box recordings until Swing House recouped all of its expenses advanced on behalf of the band over the years, then the rights to the master recordings reverted to the band, Swing House received a 10% administrative fee to account for and administering funds for the band and those working with the band, the artists themselves, the songwriters, the producers and the manager, and Jaurigui was to receive a 20% management fee.  Jaurigui Dec. ¶¶ 92, 96, 101 and 103.  According to Jaurigui, the agreements provided that Swing House was to recoup its expenses first before his management fee was to be paid and royalties to be paid to the producers.  Jaurigui Dec. ¶¶ 101 and 103.  As stated previously, these agreements were oral "handshake" agreements, not written.  Tr. at 83:12-13, 84:22-25 (Jaurigui Testimony, September 27, 2021); Exhibit N, Tender Box Recording Expenses Chart; *but see,* Tr. at 97:1-25 (Mover Testimony, September 27, 2021) (rebuttal testimony expressing skepticism about a handshake agreement between Jaurigui and The Tender Box).

147.    As Jaurigui stated in his trial declaration, "[i]t took more than 7 years for anyone to receive a payment from the The Tender Box/Kobalt contract because SH [i.e., Swing House] had to recoup all of its costs first."  Jaurigui Dec. ¶ 102; *see also,* Jaurigui Dec. ¶ 96; Exhibit N, Tender Box Recording Expenses Chart.  Regarding Swing House's recoupment of expenses for The Tender Box and payment of commissions and fees under the Kobalt contract, Jaurigui further stated in his trial declaration: "In addition to recouping 50% of master licenses, SH [Swing House] received a 20% commission of managerial fees paid to me by which I waited until SH fully recouped its expenses, plus a 10% administration fee paid to SH." Jaurigui Dec. ¶ 103.

148.    In fact no. 126 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Mover asserts that based on Winsen's trial testimony, Swing House is identified as a label in the Kobalt Co-Publishing Agreement, which affords it certain recording rights in certain songs.  Proposed Finding of Fact No. 126, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107, citing, Kobalt Co-Publishing Agreement for Tender Box, Kobalt Co-Publishing Agreement, Exhibit 26 at 102 and Tr. at 24:11, 25:7 (Winsen Testimony, Sept. 2, 2021).  This proposed finding of fact is accurate so far as it goes, but it is based on a rider to the Kobalt Co-Publishing Agreement, Exhibit 26 at 102, which is an information schedule containing exploitation information for one product that refers to Swing House as a "label" with respect to only one album by The Tender Box called "The Score" consisting of 11 tracks.  Kobalt Co-Publishing Agreement, Exhibit 26 at 101-102.  In its proposed finding of fact no. 126, Swing House reads too much into this rider to the Kobalt Co-Publishing Agreement.  It would be misleading to infer from this evidence that Swing House is the label for other albums or music of The Tender Box, also known as Silent Music Box.  Moveover, Swing House overreaches based on this one rider for one album as to The Tender Box and three unproductive licensing and production agreements for Jared in proposing its fact no. 136 that "Swing House held itself out to the recording industry as a record label to exploit the recorded works of Silent Music Box by securing revenue generating performances and other agreements on behalf of the artists, and by overseeing the administration of funds received

1    under and through these agreements for fees."  Proposed Finding of Fact No. 136, Swing

2    House's Proposed Findings of Fact and Conclusions of Law, ECF 107, *citing,* Winsen Dec. ¶

3    38, Exhibit 26 at 47, ¶ 4; Exhibit 26 at 50, ¶¶9 and 10; Winsen Dec. ¶ 39, Exhibit 26 at 7, ¶  10;

4    Winsen Dec. ¶41, Exhibit 26 at 2, ¶2(d); Winsen Dec. ¶ 42, Exhibit 26 at 3, ¶ 5, Exhibit 26 at

5    11, Rider.  The court does not adopt this proposed finding of fact based on opinion testimony

6    that lacks credibility based on insubstantial evidence.

7          149.    In his trial testimony, Jaurigui acknowledged that Swing House is a record label

8    as defined by Exhibit 26 at 102, the Kobalt Co-Publishing Agreement re: Tender Box, but

9    denied that Swing House owns licensing, distribution rights, master sync rights, publishing

10    rights to the Tender Box compositions that are the subject of the Kobalt Co-Publishing

11    Agreement.  Jaurigui Testimony, Tr. 75:2-10 (Jaurigui Testimony, Sept. 17, 2021); Kobalt Co-

12    Publishing Agreement, Exhibit 26 at 102; *see also,* Proposed Finding of Fact No. 121, Swing

13    House's Proposed Findings of Fact and Conclusions of Law, ECF 107.  In her trial testimony,

14    Winsen stated that the licensing rights, distribution rights, master sync rights and publishing

15    rights to the Tender Box song compositions were owned by Swing House. Winsen Testimony,

16    Tr. 24:7 (Winsen Testimony, Sept. 2, 2021).  In this regard, Jaurigui's testimony is credible

17    while Winsen's testimony is not because the plain language of the Kobalt Co-Publishing

18    Agreement indicates that the owner of the song compositions are the members of the Tender

19    Box, individually and collectively doing business as Silent Music Box as indicated on page one

20    of the Kobalt Co-Publishing Agreement, and that the publisher of the subject song

21    compositions on Schedule A of the agreement is Silent Music Box.  Kobalt Co-Publishing

22    Agreement, Exhibit 26 at 59, 88, 89.  Swing House is not indicated as the owner of the

23    compositions in the agreement.  *Id.*  Moreover, as the court previously found, it cannot be

24    inferred from one rider to the Kobalt Co-Publishing Agreement relating to one album of The

25    Tender Box consisting of 11 tracks listing Swing House as the label for all the albums or music

26    of The Tender Box.  Kobalt Co-Publishing Agreement, Exhibit 26 at 101-102 (rider to

27    agreement for the album, "The Score").  Accordingly, the court finds that Jaurigui is justified

28    in denying that Swing House owns licensing, distribution rights, master sync rights, publishing

rights based on the Kobalt Co-Publishing Agreement contrary to the implications of Swing House's Proposed Finding of Fact No. 121 in its Proposed Findings of Fact and Conclusions of Law, ECF 107.  *See also,* Tr. at 25:8:10 (court's comments).

150.    Jaurigui in his testimony at his meeting of creditors on September 26, 2018 acknowledged that "Publishing" is "when they own part of a songwriting of the artist." Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 26, 2018, Exhibit 33 at 9:1-2; *see also,* Proposed Finding of Fact No. 123, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

151.    In fact no. 129 of Swing House's proposed findings of fact and conclusions of law, ECF 142, Swing House asserts that with respect to the Kobalt Co-Publishing Agreement for Tender Box, advances are based on 100% ownership in album[s] where Swing House is the label.  Proposed Finding of Fact No. 129, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107, citing, Kobalt Co-Publishing Agreement, Exhibit 26 at 65 at Paragraph 5(d)(iii).  The court declines to adopt this proposed finding of fact because Swing House's proposed finding of fact is not an accurate statement of what the contract provision says, which is that advances are made based on the assumption of 100% ownership of the specific album and will be prorated if this assumption is not correct and the language of the provision does not specifically refer to Swing House.

152.    In fact no. 131 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Swing House asserts that Exhibit 28 at 1 is an account balance summary accessible through Kobalt's portal to which Swing House has access, Exhibit 28 at 1-2, indicates that Kobalt paid $45,592.43 in royalties to Swing House from First Quarter 2012 through Third Quarter 2018, although Swing House's record[s] do not show receipt of such royalties.  Proposed Finding of Fact No. 131, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107, citing, Tr. at 24:20 (Winsen Testimony, Sept. 2, 2021).  The court declines to adopt Swing House's Proposed Finding of Fact No. 131 for lack of foundation.  The document relied upon for this proposed finding of fact is an AWAL account balance summary, Exhibit 28 at 1-2.  Although Jaurigui stipulated to the admission and

authenticity of Swing House's Exhibit 28 described as Kobalt Reports, which included the

AWAL record, Joint Pretrial Stipulation, ECF 55 at 31, 34, the court determines that Winsen's

testimony about what the document means lacks foundation as her testimony is not based on

the underlying agreement(s) referred to in the AWAL record, that the only agreement referred

to in her testimony is the Kobalt Co-Publishing Agreement which does not confer rights on

Swing House and she has not otherwise shown that she has no personal knowledge of the

underlying agreement(s) that purportedly confers rights on Swing House, so that the purported

payments were earned and paid to Swing House.  The court therefore finds that Winsen's

testimony does not support her opinions, and the court declines to adopt Swing House's fact

no. 131 in its proposed findings of fact and conclusions of law, ECF 107, based on Winsen's

trial testimony and the AWAL record.

153.    In fact no. 132 of Swing House's proposed findings of fact and conclusions of

law, ECF 107, Swing House asserts that Master Synch Rights accrue to the label, Swing

House, which allows Swing House to license music "synchs," placing the music in line with

images with rights to 48 songs and the territory is defined as the World.  Proposed Finding of

Fact No. 132, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107,

citing, Tr. 24:11-12 (Winsen Testimony, Sept. 2, 2021), and AWAL record regarding

agreements, Exhibit 28 at 3-4.  Although Jaurigui stipulated to the admission and authenticity

of Swing House's Exhibit 28 described as Kobalt Reports, which included the AWAL record,

Joint Pretrial Stipulation, ECF 55 at 31, 34, the court determines that Winsen's testimony about

what the document means lacks foundation as her testimony is not based on the underlying

agreement(s) referred to in the AWAL record, that the only agreement referred to in her

testimony is the Kobalt Co-Publishing Agreement which does not confer rights on Swing

House and she has not otherwise shown that she has no personal knowledge of the underlying

agreement(s) that purportedly confers rights on Swing House.  Having reviewed the relevant

documents, the Kobalt Co-Publishing Agreement, Exhibit 26 at 59-101, the AWAL account

balance summary and agreement detail, Exhibit 28 at 1-3 and the Kobalt Reports, Exhibit 28 at

4, the court finds that Winsen's testimony that Swing House is entitled to payment of the

$45,592.43 in royalties indicated on the AWAL account balance summary based on its purported royalty rights in the Kobalt Co-Publishing Agreement not to be supported by the evidence.  Although Jaurigui stipulated to the admission and authenticity of Swing House's Exhibit 28 described as Kobalt Reports, which also included the AWAL record, Joint Pretrial Stipulation, ECF 55 at 31, 34, the court determines that Winsen's testimony about what the documents mean lacks foundation as her testimony is not based on the underlying business records of AWAL and Kobalt, that she has not otherwise shown that she has no personal knowledge of the underlying business records of AWAL and Kobalt and Swing House has not called competent witnesses with personal knowledge from AWAL and Kobalt as to what the documents mean.  Accordingly, the court determines that there is no competent and admissible evidence to prove that these records accurately reflect that royalties of $45,592.43 were purportedly paid on account of the Kobalt Co-Publishing Agreement between Kobalt and Silent Music Box.  Winsen misstates the evidence in the Kobalt Co-Publishing Agreement that the royalties are payable to Swing House as the relevant provisions of the agreement, Exhibit 26 at 63, ¶ 5, and subparagraphs, indicate that the royalties are payable to the "Owner," a defined term in the agreement referring to Silent Music Box and its members, not Swing House.  The court cannot infer from the AWAL and Kobalt documents on which Winsen's testimony is based that Swing House was entitled to royalty payments based on contract because those documents do not contain the underlying contract showing that Swing House was so entitled.  The only contract that Swing House refers to is the Kobalt Co-Publishing Agreement, which Swing House is not a signatory to, and which does not provide that the royalties on the subject song compositions owned by Silent Music Box are payable to Swing House, but to Silent Music Box as the owner.  Accordingly, the court declines to adopt Swing House's proposed fact no. 132 in its proposed findings of fact and conclusions of law, ECF 107, based on Winsen's testimony.  The court therefore finds that Winsen's testimony does not support her opinions, and the court declines to adopt Swing House's fact no. 132 in its proposed findings of fact and conclusions of law, ECF 107, based on Winsen's trial testimony.

154.    In fact no. 128 of Mover's proposed findings of fact and conclusions of law, ECF 107, Swing House asserts that the Kobalt Co-Publishing Agreement affords Swing House several different types of royalty rights, including performance rights, Exhibit 26 at 63, ¶ 5(a)(i); Mechanical Rights at Exhibit 26 at 63, ¶ 5(a)(ii); Synch Rights, Exhibit 26 at 63, ¶ 5(a)(iii); Print Income at Exhibit 26 at 63, ¶ 5(a)(iv); Black Box Funds at Exhibit 26 at 63, ¶ 5(a)(v); other income at Exhibit 26 at 64, ¶ 5(a)(vi); and cover compositions at Exhibit 26 at 63, ¶ 5(a)(vii).  Proposed Finding of Fact No. 128, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Winsen Dec. ¶ 58.  Having reviewed the relevant document, the Kobalt Co-Publishing Agreement, Exhibit 26 at 59-101, the court finds that Winsen's testimony that Swing House possesses several types of royalty rights in the song compositions of The Tender Box, dba Silent Music Box, is not credible as the testimony is not supported by the evidence.  Although Jaurigui stipulated to the admission and authenticity of Swing House's Exhibit 26 at 59-102, the Kobalt Co-Publishing Agreement, the court determines that Winsen misstates the evidence in the Kobalt Co-Publishing Agreement that the royalties are payable to Swing House as the relevant provisions of the agreement, Exhibit 26 at 63, ¶ 5, and subparagraphs, indicate that the royalties are payable to the "Owner," a defined term in the agreement referring to Silent Music Box and its members, not Swing House.  The court cannot infer from the AWAL and Kobalt documents on which Winsen's testimony is based that Swing House was entitled to royalty payments based on contract because those documents do not contain the underlying contract showing that Swing House was so entitled. The only contract that Swing House refers to is the Kobalt Co-Publishing Agreement, which Swing House is not a signatory to, and which does not provide that the royalties on the subject song compositions owned by Silent Music Box are payable to Swing House, but to Silent Music Box as the owner.  Accordingly, the court declines to adopt Swing House's fact no. 128 in his proposed findings of fact and conclusions of law, ECF 107, based on Winsen's testimony.

155.    In fact no. 133 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Swing House asserts that its rights as label in The Tender Box/Silent Music Box

in the Kobalt Co-Publishing Agreement are not found in Swing House's Chapter 11 Schedules or Statement of Financial Affairs. Proposed Finding of Fact No. 133, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107, citing Exhibit 53, Swing House's Bankruptcy Schedules A/B; Property, at 8, Part 4: Investments (none); Part 10: Intangibles and Intellectual Property at 10. The court declines to adopt Swing House's fact no. 133 in its proposed findings of fact and conclusions of law, ECF 107, because as discussed above, the court finds that Swing House does not have such rights.

156.    Jaurigui is listed in the Kobalt Co-Publishing Agreement as Silent Music Box's manager, using Swing House's address, and Jaurigui's aol.com account. Kobalt Co-Publishing Agreement, Exhibit 26 at 97; *see also,* Proposed Finding of Fact No. 134, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

157.    Melanie Barker, Swing House's Vice-President and Warren Huart, a Swing House employee, are listed in the Kobalt Co-Publishing Agreement as additional contacts for Silent Music Box. Exhibit 26 at 98; *see also,* Proposed Finding of Fact No. 135, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107

158.    In fact no. 137 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Swing House contends that based on Winsen's testimony that Swing House's records demonstrate that it has not received any money from Kobalt on account of Silent Music Box Recording Rights since 2015, despite the fact that Kobalt's reports show that it paid royalties in the sum of $259,954.20 as a result of Publishing Rights for the Third Quarter 2007 through Third Quarter 2018, Kobalt Reports, Exhibit 26 at 103-104, and $31,765 for Master Sync Rights for First Quarter 2009 through Second Quarter 2014, Kobalt Reports, Exhibit 26 at 104. Winsen Dec. ¶ 66. Although Jaurigui stipulated to the admission and authenticity of Swing House's Exhibit 28 described as Kobalt Reports, which included the AWAL record, Joint Pretrial Stipulation, ECF 55 at 31, 34, the court determines that Winsen's testimony about what the document means lacks foundation because she lacks personal knowledge as what the Kobalt Reports mean. Thus, there is no competent and admissible evidence to prove that these records accurately reflect that royalties in the amount of $259,954.20 were purportedly paid on

account of the Kobalt Co-Publishing Agreement between Kobalt and Silent Music Box.

Moreover, in asserting that Swing House's records demonstrate that it has not received any

money from Kobalt on account of Silent Music Box Recording Rights since 2015, Swing

House does not acknowledge that the Kobalt Reports only show payment of royalty income by

Kobalt on account of Silent Music Box for 2016 and afterwards of only a total of $2,689.08

and payment of royalties on Master Sync Rights of $-0- for 2016 and afterwards.  *Id.*

Accordingly, the court declines to adopt Swing House's fact no. 137 in its proposed findings of

fact and conclusions of law, ECF 107.

159.    In fact no. 143 of Swing House's proposed findings of fact and conclusions of

law, ECF 107, Swing House contends that based on Winsen's testimony, Swing House's

internal itemized accounting demonstrate that for the period November 27, 2002 through June

20, 2014 Swing House charged to the Tender Box's account a 20% management fee and a 10%

administration fee based on revenue from Kobalt, Playstation, Plastic the Movie and other

miscellaneous income.  Swing House's Proposed Findings of Fact and Conclusions of Law,

ECF 107, citing, Kobalt Reports, Exhibit 28 at 7-10 and Winsen Dec. ¶ 67.  The court declines

to adopt Swing House's fact no. 143 in its proposed findings of fact and conclusions of law,

ECF 107, because the proposed finding of fact is based on Winsen's trial declaration which in

turn is based on "Swing House's internal itemized accounting," which as described in

Winsen's trial declaration consists of the Kobalt Reports, Exhibit 28 at 7-10, which are not

Swing House's records, but the third party records of Kobalt for which there is a lack of

foundation for Winsen's testimony on what those records mean as she has not shown that she

has personal knowledge of what the records are based on and mean.

160.    In facts nos. 138 and 148 of Swing House's proposed findings of fact and

conclusions of law, ECF 107, Swing House contends that based on Winsen's testimony, Swing

House charged to Tender Box's account a 50% fee based on "CD Baby Split"[11] as shown on

---

[11] According to Winsen, CD Baby is an online music distribution platform for on-line platforms such as iTunes.
Winsen Dec. ¶ 68; *see also,* Proposed Finding of Fact No. 140, Swing House's Proposed Findings of Fact and
Conclusions of Law, ECF 107.

Exhibit N. Swing House's Tender Box Recording Expenses Ledger.  Swing House's Proposed

Findings of Fact and Conclusions of Law, ECF 107, citing, Kobalt Reports, Exhibit 28 at 7-10

and Winsen Dec. ¶ 68 and Exhibit N, Tender Box Recording Expenses Ledger.  The cited

exhibits referenced by Winsen in her trial declaration, Exhibit 28 at 7-10, are Kobalt Reports,

which do not relate to CD Baby or royalties from sales of The Tender Box music from sales

through CD Baby, and thus, the citation to such exhibits is inaccurate.  Winsen in her trial

testimony discussed the 50% CD Baby Splits, referring to Exhibit 28 at 30-33, the Swing

House ledger sheets for the Tender Box Recording Expenses.  Tr. at 26:10-16 (Winsen

Testimony, September 2, 2021).  The court also notes that the Swing House ledger sheets for

Tender Box Recording Expenses are also Exhibit N, which lists five entries for a "50% CD

Baby Splits" between December 10, 2012 and July 2, 2013, but the aggregate amount of such

splits is modest, $263.00.  Exhibit N, Tender Box Recording Expenses; *see also,* Tr. at 93:12-

14 (Jaurigui Testimony, September 17, 2021).  Based on Exhibit N, Tender Box Recording

Expenses Ledger, Swing House collected a total of $263.00 from "50% CD Baby Splits,"

which funds were applied to recoup expenses advanced by Swing House to The Tender Box

for its rehearsal and recording expenses.

      161.    In fact no. 144 of Swing House's proposed findings of fact and conclusions of

law, ECF 142, Swing House contends that it is identified as the record label at Trial Exhibit 26

at 102, which lists Swing House as the owner of "master synch rights" in 48 songs as described

in the "rights summaries" at Exhibit 26 at 3.  Swing House's Proposed Findings of Fact and

Conclusions of Law, ECF 107, citing, Exhibit 26 at 102 and Exhibit 26 at 3.  The court

declines to adopt Swing House's proposed finding of fact no. 144 because it is not supported

by the evidence: (1) the identification of Swing House as a record label on a rider to the Kobalt

Co-Publishing Agreement relating to a single album by The Tender Box entitled "The Score"

does not show that Swing House is the label on other albums by The Tender Box; (2) the

citation of Exhibit 26 at 3 is incorrect as that citation relates to the Listenable Records

agreement with Jared, not The Tender Box, and apparently, Swing House was referring to the

AWAL business record pertaining to agreements in Exhibit 28 at 3 as the record he relies

upon; (3) there is no competent and admissible evidence from a witness with personal

knowledge of what the AWAL business record pertaining to agreements purportedly

describing rights of Swing House means; (4) the AWAL business record pertaining to

agreements is also objectionable because it is inadmissible hearsay and not the best evidence of

the underlying agreement which may define the rights of the parties, such as Kobalt, Silent

Music Box and Swing House, Federal Rules of Evidence 801 *et seq.* and 1001 *et seq*., and (5)

the underlying agreement, the Kobalt Co-Publishing Agreement, indicates that the "owner" of

the rights of the song compositions of Silent Music Box is Silent Music Box and its members,

and Swing House has not shown that the agreement itself provides that Swing House is the

owner of the rights.

162.    In fact no. 145 of Swing House's proposed findings of fact and conclusions of

law, ECF 107, Swing House contends that it received the sum of $5,178.80 from Kobalt,

Exhibit 26 at 104 and paid itself its 20% Management Fee and 10% Administration Fee in the

sum of $1,553.64 on or about September 24, 2015. Swing House's Proposed Findings of Fact

and Conclusions of Law, ECF 107, citing, Exhibit 27 at 13, Tr. at 76:10-12 (Jaurigui

Testimony, Sept. 27, 2021) and Winsen Dec. ¶ 69. The court declines to adopt Swing House's

proposed finding of fact no. 145 because it is not supported by the evidence: (1) the Kobalt

Reports, Exhibit 26 at 104, purportedly showing Swing House's receipt of royalty payment

funds is not properly authenticated by a custodian of records of Kobalt, and there is no

competent and admissible evidence from a witness with personal knowledge of what the

records means; and (2) the Kobalt Reports are also objectionable because they are inadmissible

hearsay and not the best evidence of the underlying agreement which may define the rights of

the parties, such as Kobalt, Silent Music Box and Swing House, Federal Rules of Evidence 801

*et seq.* and 1001 *et seq*. Based on the testimony of Jaurigui and Winsen and the check in the

amount of $1,553.64, the court finds that Swing House received funds from Kobalt for Silent

Music Box for the second quarter of 2015, of which $1,553.64 was disbursed by check to

Swing House for its "Kobalt 2Q split" for 2015, that is, for its share of the funds payable to

Silent Music Box from Kobalt. Based on Jaurigui's trial declaration, the court finds that based

on agreements between Swing House and Silent Music Box, Swing House was entitled to

recoup its expenses paid on behalf of The Tender Box, doing business as Silent Music Box,

from 50% of the master license royalties, and a 10% administrative fee from the royalties

earned by The Tender Box.  As to the 20% management fee owed by The Tender Box for

"artist management", the parties dispute whether or not Jaurigui is entitled to the fee personally

as the manager for The Tender Box or Swing House is entitled to the fee for Jaurigui's services

as an agent of Swing House.  Based on Jaurigui's testimony, which the court finds credible,

Jaurigui managed The Tender Box personally and is entitled to the 20% management fee in his

personal capacity.  However, the court acknowledges and finds that the check payable to

Swing House in the amount of $1,553.64 represents 30% of the amount of $5,178.80, the

amount reflected on the Kobalt Reports for the second quarter of 2015, and that the check on

Silent Music Box's checking account was signed by Jaurigui for Silent Music Box and made

payable to Swing House, and not also to himself personally as the manager of The Tender Box.

163.    Exhibit 27 at 20 is an email from Melanie Barker to Jaurigui which attached a

spreadsheet breaking down how Kobalt's royalty payment was to be distributed between

administrative, management and writer's fees, but the attachment with the breakdown was not

part of the exhibit.  Accordingly, the court declines to so find that the email had broken down

Kobalt's royalty payment to be distributed between administrative, management and writer's

fees as set forth in Swing House's proposed finding of fact no. 146.  *See* Swing House's

Proposed Findings of Fact and Conclusions of Law, ECF 107.

164.    On September 25, 2015, Jaurigui signed a check from Silent Music Box to

Swing House for Kobalt Q2 Split in the sum of $1,553.64.  Exhibit 27 at 13.

165.    In fact no. 148 of Swing House's proposed findings of fact and conclusions of

law, ECF 107, Swing House contends that on July 1, 2015, Melanie Barker, Swing House's

Vice-President forwarded paperwork to arrange payment to The Tender Box by bank transfer,

Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107, citing,  Exhibit

27 at 14, and that since 2015, Swing House has not received any money directly from Kobalt,

Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Tr. at

27:3 (Winsen Testimony, Sept. 2, 2021).  The court declines to find that Melanie Barker on

behalf of Swing House forwarded paperwork to arrange payment to The Tender Box by bank

transfer as the email does not describe the paperwork and its purpose and the paperwork which

was an attachment to the email was not made part of the exhibit.  With respect to the proposed

finding of fact that since 2015, Swing House has not received any money directly from Kobalt,

it must be clarified that the finding of fact relates only to the Kobalt Co-Publishing Agreement

relating to The Tender Box, dba Silent Music Box.  Presumably, this paperwork enabled Silent

Music Box to receive its royalties under the Kobalt Co-Publishing Agreement from Kobalt

directly as Silent Music Box, Swing House and Jaurigui agreed at the end of 2015 that Silent

Music Box/The Tender Box would handle its own administration and management since The

Tender Box disbanded, there was no further need for administration and management outside

the band, and the revenues were declining.

166.    In facts nos. 149 and 150 of Swing House's proposed findings of fact and

conclusions of law, ECF 107, Swing House contends that Kobalt's summary of accounts dated

December 4, 2020, Exhibit 34 at 3 shows that Kobalt paid $1,732.64 in royalties on accounts

of its publishing rights in Silent Music Box for the Third Quarter of 2020, at Exhibit 34 at 7,

Kobalt's Royalty Value Analysis Split by Right Type for the end of the Third Quarter 2020

demonstrates that Silent Music Box has been generating revenues for 2017-2018 and Swing

House did not receive any monies from Kobalt for this time period.  Swing House's Proposed

Findings of Fact and Conclusions of Law, ECF 107, citing, Winsen Dec. ¶¶ 70-71.  Although

Jaurigui stipulated to the admission and authenticity of Swing House's Exhibit 28 described as

Kobalt Reports, Joint Pretrial Stipulation, ECF 56 at 31, 34, the court determines that Winsen's

testimony about what the Kobalt Reports means lack foundation because she lacks personal

knowledge as what the reports mean. Thus, there is no competent and admissible evidence to

prove that these records accurately reflect that royalties were purportedly generated in 2017-

2018 and paid in 2020 on account of the Kobalt Co-Publishing Agreement between Kobalt and

Silent Music Box.  Accordingly, the court declines to adopt Swing House's facts nos. 149 and

150 in its proposed findings of fact and conclusions of law, ECF 107.   Based on the

agreements between The Tender Box, Swing House and Jaurigui, as shown by Exhibit N, Tender Box Recording Expenses, and Jaurigui's testimony, which the court finds credible, Swing House recouped its expenses advanced on behalf of The Tender Box by June 2014, Swing House's administrative work and Jaurigui's managerial work ended at request of the Tender Box in 2015, and thus, there were no funds for Swing House to receive.  Swing House did not call members of The Tender Box, the other parties to the agreements, as witnesses at trial to refute this evidence, that is, Exhibit N, the Tender Box Recording Expenses Ledger, and Jaurigui's testimony.

167.    In fact no. 151 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Swing House contends that its records do not reflect that it assigned any of its rights in Silent Music Box.  Proposed Finding of Fact No. 151, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Tr. at 28:6 (Winsen Testimony, September 2, 2021).  The court declines to adopt Swing House's fact no. 151 in its proposed findings of fact and conclusions of law, ECF 107, because as discussed above, the evidence does not prove that Swing House had rights in Silent Music Box from the relevant agreement, the Kobalt Co-Publishing Agreement between Kobalt and Silent Music Box.  There was no assignment of rights by Swing House because it did not have any such rights.

168.    In fact no. 152 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Swing House contends that based on Winsen's trial testimony, an AWAL business record relating to synchs, Exhibit 28 at 14, shows instances of activity pursuant to which Swing House earned money and should have been paid, for recording rights for synchs. Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107, citing, Tr. at 28:4, 15 (Winsen Testimony, Sept. 2, 2021).  Although Jaurigui stipulated to the admission and authenticity of Swing House's Exhibit 28 described as Kobalt Reports, which included the AWAL record, Joint Pretrial Stipulation, ECF 55 at 31, 34, the court determines that Winsen's testimony about what the document means lacks foundation as her testimony is not based on the underlying agreement(s) referred to in the AWAL record, that the only agreement referred to in her testimony is the Kobalt Co-Publishing Agreement which does not confer rights on

1    Swing House and she has not otherwise shown that she has no personal knowledge of the

2    underlying agreement(s) that purportedly confers rights on Swing House, so that the purported

3    payments were earned and paid to Swing House.  Accordingly, there is no competent and

4    admissible evidence to prove that this record shows synch activity for which Swing House

5    earned money and was not paid.  Accordingly, the court declines to adopt Swing House's fact

6    no. 152 in its proposed findings of fact and conclusions of law, ECF 107, based on Winsen's

7    testimony.

8         169.    In fact no. 153 of Swing House's proposed findings of fact and conclusions of

9    law, ECF 107, Swing House contends that based on Winsen's trial testimony, a Kobalt report

10   relating to synchs, Exhibit 28 at 16 shows instances of activity pursuant to which Swing House

11   earned money and should have been paid for its publishing rights.  Proposed Finding of Fact

12   No. 153, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing,

13   Tr. at 28:16 (Winsen Testimony, Sept. 2, 2021).  Although Jaurigui stipulated to the admission

14   and authenticity of Mover's Exhibit 28 described as Kobalt Reports, Joint Pretrial Stipulation,

15   ECF 55 at 31, 34, the court determines that Winsen's testimony about what the Kobalt Report

16   means lacks foundation as her testimony is not based on the underlying agreement(s) referred

17   to in the Kobalt Report, that the only agreement referred to in her testimony is the Kobalt Co-

18   Publishing Agreement which does not confer rights on Swing House and she has not otherwise

19   shown that she has no personal knowledge of the underlying agreement(s) that purportedly

20   confers rights on Swing House, so that the purported payments were earned and paid to Swing

21   House.  Accordingly, there is no competent and admissible evidence to prove that this record

22   shows synch activity for which Swing House earned money and was not paid.  Based on the

23   agreements between The Tender Box, Swing House and Jaurigui, as shown by Exhibit N,

24   Tender Box Recording Expenses, Swing House recouped its expenses advanced on behalf of

25   The Tender Box by June 2014, Swing House's administrative work and Jaurigui's managerial

26   work ended at request of the Tender Box in 2015, and thus, there were no funds for Swing

27   House to receive. Accordingly, the court declines to adopt Swing House's fact no. 153 in its

28   proposed findings of fact and conclusions of law, ECF 107, based on Winsen's testimony.

170.    In fact no. 154 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Swing House contends that Kobalt's reports show that Silent Music Box's royalties for its publishing rights for the period Quarter 3 2006 through Quarter 3 2017 were $259,954.  Proposed Finding of Fact No. 154, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Kobalt Reports, Exhibit 26 at 103 and 104.  Although Jaurigui stipulated to the admission and authenticity of Swing House's Exhibit 28 described as Kobalt Reports, which included the Kobalt account balance summary record, Joint Pretrial Stipulation, ECF 55 at 31, 34, Swing House has not called competent witnesses with personal knowledge from Kobalt as to what the reports mean, and thus, there is no competent and admissible testimony about what the underlying information on which the reports are based and what the reports mean.  Based on the agreements between The Tender Box, Swing House and Jaurigui, as shown by Exhibit N, Tender Box Recording Expenses, Swing House recouped its expenses advanced on behalf of The Tender Box by June 2014, Swing House's administrative work and Jaurigui's managerial work ended at request of the Tender Box in 2015, and thus, there were no funds for Swing House to receive.  Accordingly, the court declines to adopt Swing House's fact no. 154 in its proposed findings of fact and conclusions of law, ECF 107.

171.    In fact no. 155 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Swing House contends that based on Jaurigui's and Winsen's testimony Swing House should have been paid 20% of $259,954.20 for its management fee, but it was not. Proposed Finding of Fact No. 155, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107, citing, Exhibit 28 at 104 and 105 and Exhibit 27 at 13.   The court declines to adopt Swing House's proposed finding of fact no. 155 in its proposed findings of fact and conclusions of law, ECF 107, because: (1) although Swing House states that it relies upon Jaurigui's and Winsen's testimony in support of its proposed finding of fact, it does not cite to any specific testimony of these witnesses; (2) the only evidence cited to for this proposed finding of fact is a Kobalt report for account balance summary and a copy of a check written by Jaurigui on the Silent Music Box checking account dated September 24, 2015 payable to

Swing House in the amount of $1,553.64 for "Kobalt Q2 Split"; (3) regarding the Kobalt reports, Swing House has not called competent witnesses with personal knowledge from Kobalt as to what the reports mean, and thus, there is no competent and admissible testimony about what the underlying information on which the reports are based and what the reports mean; (4) regarding the one check for the "Kobalt 2Q Split" in the amount of $1,553.64, a check in that small amount on Silent Music Box's checking account does not substantiate purported royalty payments in much larger amount by Kobalt, a different payer (though the check with Jaurigui's "Kobalt 2Q" notation is some evidence of a Kobalt royalty payment to Silent Music Box and a subsequent distribution from that payment to Swing House); (5) as the court previously stated, it finds that The Tender Box, dba Silent Music Box, was managed by Jaurigui personally, and thus, he, not Swing House, was entitled to the 20% management fee on Silent Music Box's royalties based on their agreements; and (6) the cited evidence, the Kobalt Reports and the single Silent Music Box check of September 2015 do not support an inference that the 20% management fee owed by Silent Music Box to Jaurigui was not paid. Based on the agreements between The Tender Box, Swing House and Jaurigui, as shown by Exhibit N, Tender Box Recording Expenses, Swing House recouped its expenses advanced on behalf of The Tender Box by June 2014, Swing House's administrative work and Jaurigui's managerial work ended at request of the Tender Box in 2015, and thus, there were no funds for Swing House to receive.

172.    In fact no. 155 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Swing House also contends that based on Jaurigui's and Winsen's testimony Swing House should have been paid 10% of $259,954 for its administrative fee, but it was not. Proposed Finding of Fact No. 155, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing Exhibit 28 at 104-105; Exhibit 27 at 13. The court again declines to adopt Swing House's fact no. 155 in its proposed findings of fact and conclusions of law, ECF 107, because: (1) although Swing House states that it relies upon Jaurigui's and Winsen's testimony in support of his proposed finding of fact, it does not cite to any specific testimony of these witnesses; (2) the only evidence cited to for this proposed finding of fact is a Kobalt

report for account balance summary and a copy of a check written by Jaurigui on the Silent

Music Box checking account dated September 24, 2015 payable to Swing House in the amount

of $1,553.64 for "Kobalt Q2 Split"; (3) regarding the Kobalt reports, Swing House has not

called competent witnesses with personal knowledge from Kobalt as to what the reports mean,

and thus, there is no competent and admissible testimony about what the underlying

information on which the reports are based and what the reports mean; (4) regarding the one

check for the "Kobalt 2Q Split" in the amount of $1,553.64, a check in that small amount on

Silent Music Box's checking account does not substantiate purported royalty payments in

much larger amount by Kobalt, a different payer (though the check with Jaurigui's "Kobalt

2Q" notation is some evidence of a Kobalt royalty payment to Silent Music Box and a

subsequent distribution from that payment to Swing House); (5) ) the cited evidence, the

Kobalt Reports and the single Silent Music Box check of September 2015 do not support an

inference that the 10% management fee owed by Silent Music Box to Jaurigui was not paid;

and (6) as the court previously found, The Tender Box, dba Silent Music Box, paid Swing

House, its 10% administrative fee on Silent Music Box's royalties based on their agreements.

Based on the agreements between The Tender Box, Swing House and Jaurigui, as shown by

Exhibit N, Swing House's Tender Box Recording Expenses Ledger, Swing House recouped its

expenses advanced on behalf of The Tender Box by June 2014, Swing House's administrative

work and Jaurigui's managerial work ended at request of the Tender Box in 2015, and thus,

there were no funds for Swing House to receive.

173.    Jaurigui testified that he, not Swing House, had a right to payment for

management fees for management of The Tender Box arising out of any royalty payments

made by Kobalt to Silent Music Box, but such rights are not listed as an asset in his bankruptcy

schedules.  Tr. at 76:27, 77:3 (Jaurigui Testimony, Sept. 17, 2021); *see also,* Proposed Finding

of Fact No. 156, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

However, Jaurigui was only the manager of The Tender Box during the time the band was

together between 2006 and 2012 and was no longer the band's manager when the band split up

in 2012.  Jaurigui Dec. ¶¶ 91 and 93.  Jaurigui had management fee rights "if money came in,"

1   but little money came in. Tr. at 85:5-9 (Jaurigui Testimony, September 27, 2021).  According

2   to Jaurigui, he waived his management fee for many years to make sure that Swing House got

3   paid its expenses first and did not take any fees personally until Swing House's expenses were

4   paid, which were fully paid in 2014.  Tr. at 85:5-10 (Jaurigui Testimony, September 27, 2021);

5   Exhibit N, Tender Box Recording Expenses.  Afterwards, Jaurigui received "some payments

6   after 2014," "2-3 times for 2014 to 'now'," a "[f]ew thousand dollars."  *Id.*  As noted

7   previously, Jaurigui testified at his meeting of creditors on September 26, 2018 that he received

8   $2,000 to $3,000 in royalties attributable to The Tender Box in the twelve months before the

9   meeting.  Exhibit 33 at 16-17.  In his trial declaration, Jaurigui stated that he "believed that [he]

10   received approximately $1,333.00 during the period of 2014-2017."  Jaurigui Dec. ¶ 108.

11         174.  In fact no. 154 of Swing House's proposed findings of fact and conclusions of

12   law, ECF 107, Swing House contends that Kobalt provided quarterly royalty accountings to

13   Swing House from 2006 through March 31, 2018 and Exhibit 26 at 103 and 104 show that

14   Kobalt paid royalties for publishing rights in the sum of $259,954 for the Third Quarter of

15   2007 through Third Quarter 2017.  Proposed Finding of Fact No. 154, Swing House's

16   Proposed Findings of Fact and Conclusions of Law, ECF 107, citing, Kobalt Reports, Exhibit

17   26 at 103 and 104.  Although Jaurigui stipulated to the admission and authenticity of Swing

18   House's Exhibit 28 described as Kobalt Reports, which included the Kobalt account balance

19   summary record, Joint Pretrial Stipulation, ECF 56 at 31, 34, Swing House has not called

20   competent witnesses with personal knowledge from Kobalt as to what the reports mean, and

21   thus, there is no competent and admissible testimony about what the underlying information on

22   which the reports are based and what the reports mean.  Accordingly, the court declines to

23   adopt Swing House's proposed finding of fact no. 154 in his proposed findings of fact and

24   conclusions of law, ECF 107.

25         175.  In fact no. 157 of Swing House's proposed findings of fact and conclusions of

26   law, ECF 107, Swing House contends that Exhibit 26 at 104 shows that Kobalt paid royalties

27   due for master synch rights in the sum of $31,765 for First Quarter 2009 through Second

28   Quarter 2014.  Proposed Finding of Fact No. 157, Swing House's Proposed Findings of Fact

1   and Conclusions of Law, ECF 142, citing, Kobalt Reports, Exhibit 26 at 104.  Although

2   Jaurigui stipulated to the admission and authenticity of Swing House's Exhibit 28 described as

3   Kobalt Reports, which included the Kobalt account balance summary record, Joint Pretrial

4   Stipulation, ECF 55 at 31, 34, Swing House has not called competent witnesses with personal

5   knowledge from Kobalt as to what the reports mean, and thus, there is no competent and

6   admissible testimony about what the underlying information on which the reports are based

7   and what the reports mean.  Accordingly, the court declines to adopt Swing House's fact no.

8   157 in its proposed findings of fact and conclusions of law, ECF 142.

9          176.    In fact no. 159 of Swing House's proposed findings of fact and conclusions of

10  law, ECF 107, Swing House contends that it is the 50% master owner of the song "Here We

11  Go".   Proposed Finding of Fact 159, Swing House's Proposed Findings of Fact and

12  Conclusions of Law, ECF 142, citing, Exhibit 27 at 22.  The court declines to adopt Swing

13  House's fact no. 159 in its proposed findings of fact and conclusions of law, ECF 107, because

14  the proposed finding of fact is based on an email exchange between a Kobalt sales

15  representative, Guy Sylvester, and Jaurigui and Melanie Barker at Swing House on November

16  24, 2011 in which Sylvester was relaying a sales proposal to Swing House which he made to a

17  prospective customer called Lovefilm, which was a DVD rental service, for use of the song,

18  "Here We Go," based on a 50/50 split of royalties as "Master owner" between Silent Music

19  Box and Swing House, that is, the reference that the "Master owner" was 50% Swing House

20  was made by Sylvester at Kobalt, and not an admission by Jaurigui for Swing House, and thus,

21  such representation by a third party does not prove that Swing House was a 50% master owner

22  of the song since there is no evidence of acquisition of ownership of rights to the song by

23  Swing House, such as an agreement between Swing House and The Tender Box, dba Silent

24  Music Box, as the artist/composer.

25         177.    Abarth is a Spanish car company that licensed the Tender Box song

26  composition, "Here We Go," in 2017.  AWAL Royalty Printout, Exhibit 28 at 22; Email

27  correspondence relating to licensing of "Here We Go," Exhibit 35 at 4; *see also,* Proposed

28

Finding of Fact No. 160, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

178.    Jaurigui testified that The Tender Box earned $5,000 to $10,000 from Kobalt royalties in 2018, and the money was split among each band member, "a few thousand to each," there being six band members, four core members and two shorter time members.  Tr. 86:1-4 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 161, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142.

179.    Jaurigui testified that The Tender Box earned between $1200 to $2500 from Kobalt royalties in 2020, and the money is split among the band members, "a couple of hundred dollars to each band member." Tr. 85:25-26 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 162, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.  That the members of The Tender Box split royalties among themselves after 2015 is consistent with other evidence that they no longer used Jaurigui as their manager when the band broke up in 2012 and split the royalties received from Kobalt after 2016 among themselves after taking over their own financial management in 2015. Jaurigui Dec. ¶¶ 91-93, 105.

180.    In fact no. 163 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Swing House asserts that Jaurigui's denials about the rights granted to Swing House as a result of the Co-Publishing Agreement executed between the Silent Music Box, dba Tender Box and the Kobalt Publishing Agreement dated September 22, 2006 ("Co-Publishing Agreement") are not credible.  Proposed Finding of Fact No. 163, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Winsen Dec. ¶ 58.  As the court previously stated, having reviewed the relevant document, the Kobalt Co-Publishing Agreement, Exhibit 26 at 59-101, the court found that Swing House's evidence primarily consisting of Winsen's testimony for his contention that Swing House possesses several types of royalty rights in the song compositions of The Tender Box, dba Silent Music Box, is not credible as the testimony is not supported by the evidence.  Although Jaurigui stipulated to the admission and authenticity of Swing House's Exhibit 26 at 59-102, the Kobalt Co-Publishing

1  Agreement, the court determined that Winsen misstates the evidence in the Kobalt Co-

2  Publishing Agreement that the royalties are payable to Swing House as the relevant provisions

3  of the agreement, Exhibit 26 at 63, ¶ 5, and subparagraphs, indicate that the royalties are

4  payable to the "Owner," a defined term in the agreement referring to Silent Music Box and its

5  members, not Swing House.  The court cannot infer from the AWAL and Kobalt documents on

6  which Winsen's testimony is based that Swing House was entitled to royalty payments based

7  on contract because those documents do not contain the underlying contract showing that

8  Swing House was so entitled.  The only contract that Swing House refers to is the Kobalt Co-

9  Publishing Agreement, which Swing House is not a signatory to, and which does not provide

10 that the royalties on the subject song compositions owned by Silent Music Box are payable to

11 Swing House, but to Silent Music Box as the owner.  Accordingly, the court declines to adopt

12 Swing House's fact no. 163 in its proposed findings of fact and conclusions of law, ECF 107,

13 because the evidence justifies Jaurigui's denial of Swing House's purported rights from the

14 Kobalt Co-Publishing Agreement.

15      181.    On February 13, 2018, Jaurigui admitted that he deleted previous e-mails about

16 an event called "East of Eli" from Swing House's server.  Swing House e-mails, Exhibit 46 at

17 20 and 24.  Tr. 77:20 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact

18 No. 164, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142.

19      182.    Jaurigui knew that at least one member of his team, Megan, was uncomfortable

20 doing a deal outside of Swing House as reflected in Swing House e-mails, Exhibit 46 at 21; *see*

21 *also,* Proposed Finding of Fact No. 165, Swing House's Proposed Findings of Fact and

22 Conclusions of Law, ECF 142.

23      183.    In fact no. 166 of Swing House's proposed findings of fact and conclusions of

24 law, ECF 107, Swing House contends that after Winsen became Director of Operations in

25 October 2015, Mover discovered that Jaurigui concealed from Mover and Swing House's

26 board of directors the full nature and extent of Swing House's dispute with 7175 WB, and that

27 Swing House had defaulted on the Willoughby lease in August 2014.  Proposed Finding of

28 Fact No. 166, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107,

citing, Mover Dec. ¶ 38 and Winsen Dec. ¶¶ 30-31.  The court declines to adopt Swing

House's fact no. 186 in its proposed findings of fact and conclusions of law, ECF 107, as stated

because the cited testimony in the Mover and Winsen Declarations only stated that Jaurigui

failed to disclose to them that Swing House had defaulted on its lease with 7175 WB, not that

Jaurigui "concealed from Mover and the Swing House's board of directors the full nature and

extent of Swing House's dispute with its Willoughby landlord, 7175 WB." However, based on

the cited testimony in the Mover Declaration, the court will find that Jaurigui concealed from

Mover that Swing House had defaulted on the Willoughby lease in August 2014, which was

material as to Mover's making of his second loan of $50,000 to Swing House in September

2014.

184.    In fact no. 167 of Swing House's proposed findings of fact and conclusions of

law, ECF 107, Swing House contends that Jaurigui did not disclose to Mover or Winsen that

7175 WB filed its lawsuit against Swing House owed $37,981 for unpaid rent, $556,759 for

removal of improvements, $163,478 for lost rent and $192,295 in interest and attorneys' fees.

Proposed Finding of Fact No. 167, Swing House's Proposed Findings of Fact and Conclusions

of Law, ECF 142, citing Mover Dec. ¶ 38.  The court declines to adopt Swing House's fact no.

167 in its proposed findings of fact and conclusions of law, ECF 107, as stated because the

cited testimony in the Mover Declaration does not attest to the amounts that Swing House

allegedly owed for unpaid rent, removal of improvements, lost rent and interest and attorneys'

fees.  However, based on the cited testimony in the Mover Declaration, the court will find that

Jaurigui had not disclosed to Mover or Winsen that 7175 WB filed its lawsuit against Swing

House on or about October 8, 2015.

185.    In Swing House's opinion based on Mover's testimony, Jaurigui had three

opportunities to settle the litigation with 7175 WB.  Proposed Finding of Fact No. 168, Swing

House's Proposed Findings of Fact and Conclusions of Law, ECF 107.  According to Mover,

the first time, in or about the first or second quarter of 2016 when Swing House was located at

Casitas, Jaurigui showed Mover and Winsen a demand letter from 7175 WB's attorneys

seeking approximately $56,000 in damages to settle the then-pending lawsuit, and Jaurigui

asked for advice from Mover and Winsen and told them that the demand was unfounded.  *Id.,*
citing, Mover Dec. ¶ 39.  Mover advised Jaurigui to settle the matter by paying the past due
rent since Swing House owed the rent.  *Id.,* citing, Mover Dec. ¶¶ 39-40; Tr. at 4:20, 11:1-8
(Mover Testimony, August 19, 2021).

186.    In Swing House's opinion based on Mover's testimony, the second time that
Jaurigui had an opportunity to settle the lawsuit with 7175 WB, 7175 WB's counsel demanded
$100.000, and Mover and Winsen suggested to Jaurigui to settle the case for $100,000.
Proposed Finding of Fact No. 169, Swing House's Proposed Findings of Fact and Conclusions
of Law, ECF 107, citing, Mover Dec. ¶ 40.  In the Fall of 2016, Jaurigui made a $100,000 offer
to settle the lawsuit, but 7175 WB would not accept that settlement proposal.  Mover Dec. ¶
41.

187.    According to Jaurigui in his trial declaration, in late 2014, he engaged in
numerous email exchanges with Eve Steele and Peter Gelles, the owners of landlord 7175 WB,
regarding a settlement of 7175 WB's claims against Swing House, and Jaurigui hired the law
firm of Greenberg & Bass to resolve the disputes with the 7175 WB landlord, and Greenberg &
Bass advised him to stipulate to a surrender of the Willoughby property.  Jaurigui Dec. ¶¶ 67-
68.  On October 16, 2015, 7175 WB sued Jaurigui for over $900,000 in the state court related
to the Willoughby lease.  Jaurigui Dec. ¶ 69.  On the eve of filing Swing House's bankruptcy,
Jaurigui offered the landlord $125,000 cash to resolve the disputes with them that they
rejected.  Jaurigui Dec. ¶ 68.  The 7175 WB landlord also sued Jaurigui in the bankruptcy
court.  Jaurigui Dec. ¶ 69.

188.    Regarding Mover's advice to him regarding the disputes with the Willoughby
landlord, Jaurigui stated in his trial declaration: "Ironically, I vividly remember a conversation
I had with Mover where we were discussing 7175's demands where Mover said to me 'it's too
much *uck them, don't pay them.'  Mover encouraged me to file bankruptcy for SH rather than
pay the landlord any monies."  Jaurigui Dec. ¶ 71.  Moreover, Jaurigui recalled in his trial
declaration that Mover sent an email to a representative of D'Addardio Co., and him dated
September 1, 2016, Exhibit D, writing: ". . . it's come to the point where it looks like the best

move for phil is to file bankruptcy, the former landlord is being relentless and ridiculous and absolutely out of control." Jaurigui Dec. ¶ 72; *see also,* Tr. at 4:21-23 (Mover Testimony, August 19, 2021).

189.     As reflected in the minutes of the meeting of Swing House's Board of Directors on April 9, 2015, the board first discussed the possibility of filing a Chapter 11 bankruptcy case.  Swing House, Minutes of Board of Directors, April 9, 2015, Exhibit 16; *see also,* Proposed Finding of Fact No. 18, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.  The board meeting was conducted by conference call, and the minutes reflect that the directors attending the meeting were Jaurigui, Mover, Melanie Barker, James Hutt and Robert D'Addario.  *Id.* The board adopted a resolution that it wanted to avoid bankruptcy at this time, if all possible.  *Id.*

190.     As reflected in the minutes of the meeting of Swing House's Board of Directors on June 1, 2015, the board discussed a letter of intent by "D'Addario," presumably Jim D'Addario and D'Addario Co., to purchase Swing House and buy out the existing shareholders, Minutes of Board of Directors, June 1, 2015, Exhibit 18; *see also,* Proposed Finding of Fact No. 19, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.  A condition of the letter of intent was that Jaurigui would be made an "at-will" employee unless and until he met certain company goals within three years from the date of the purchase by D'Addario and if those goals were met, Jaurigui would earn back a specified percentage of equity.  Jaurigui stated at the meeting that the transaction would take 90 days to complete and that the letter of intent needed to be signed by June 5, 2015.  *Id.*   The board meeting was conducted by conference call, and the minutes reflect that the directors attending the meeting were Jaurigui, Mover, Melanie Barker and James Hutt.  *Id.*  The board adopted a resolution that Swing House would request that the letter of intent be amended to provide that Jaurigui had a right of first refusal should D'Addario receive an offer from a third party to buy the business and approved the signing of the letter of intent by Friday June 1, 2015.  *Id.*  There is no evidence that this transaction ever went through.

191.    Jaurigui has owned the residence at 1483 N. Occidental Boulevard, Los Angeles, California since 2002.  Tr. 94:15 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 170, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

192.    Jaurigui purchased the residence with his ex-wife and kept the residence following their divorce in 2008.  Tr. 94:16-18 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 171, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

193.    Jaurigui put Alexandra Greenberg ("Greenberg") on title on his residence at 1483 N. Occidental Boulevard, Los Angeles, California in 2011.  Tr. 94:19-20 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 172, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

194.    Jaurigui and Greenberg hold title to the residence at 1483 N. Occidental Boulevard, Los Angeles, California as Joint Tenants.  Tr. 89:3 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 173, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

195.    Jaurigui and Greenberg have never married.  Tr. 89:4 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 174, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

196.    Jaurigui testified that when Greenberg was added to the title of 1483 N. Occidental Boulevard, she did not pay Jaurigui any money, but she had made monthly mortgage payments.  Tr. 94:21-24 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 175, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

197.    Jaurigui produced no evidence of the amount of money that Greenberg allegedly paid to him or that she had made mortgage payments on the residence at 1483 N. Occidental Boulevard, Los Angeles, California.  Tr. 95:5-11 (Jaurigui Testimony, Sept. 27, 2021); *see*

*also,* Proposed Finding of Fact No. 176, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

198.    Jaurigui and Greenberg refinanced the Occidental Boulevard residence within 90 days of Jaurigui's filing his Chapter 11 bankruptcy case and took $140,000 cash out of the refinancing proceeds.  Tr. 95:12-13; 89:8 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 177, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142.

199.    Jaurigui in his trial testimony stated that he spent the funds he obtained from the refinancing proceeds on attorneys' fees, including a deposit for filing the bankruptcy case on behalf of Swing House to Kurt Ramlo at Levene Neale, et al., fees to Greenberg and Bass which was handling his case with 7175 WB and a deposit for filing his personal bankruptcy case to Leonard Pena.  Tr. at 87:3-6 (Jaurigui Testimony, Sept. 17, 2021).  Jaurigui testified at his 11 U.S.C. § 341(a) meeting of creditors hearing that he paid his bankruptcy attorney with cash he obtained from the 2016 refinance, which he failed to identify (or amend) on his Form 2030 Disclosure of Attorney's Compensation.  Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 26, 2018, Exhibit 33 at 21:17-24; 26:14-16; Jaurigui's Bankruptcy Schedules and Statement of Financial Affairs, Exhibit 50 at 44; *see also,* Proposed Finding of Fact No. 178, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

200.    Jaurigui testified at trial that he provided a breakdown of how the refinancing proceeds were spent to the Chapter 7 trustee at the 11 U.S.C. § 341(a) meeting of creditors.  Tr. at 89:9-12 (Jaurigui Testimony, Sept. 27, 2021)

201.    Jaurigui did not object to Mover's claim in his bankruptcy case.  Schedule F, Jaurigui's Bankruptcy Petition, ECF 17 (scheduling Mover's unsecured claim as not disputed, not contingent and not unliquidated), and Claims Register and Case Docket, Bankruptcy Case No. 2:16-bk-24760-RK; *see also,* Proposed Finding of Fact No. 180, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107.

202.    Swing House did not object to Mover's claims in this Chapter 11 bankruptcy case.  Claims Register and Case Docket, Bankruptcy Case No. 2:16-bk-24758-RK; *see also,* Proposed Finding of Fact No. 179, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142.

203.    In fact no. 181 of Swing House's proposed findings of fact and conclusions of law, ECF 142, and its subparagraphs, Swing House contends that each time Jaurigui was confronted during trial with a fact from Swing House's records adverse to his position, he testified that Swing House's records were the result of a mistake or error by various persons or entities:

a.    Jaurigui contends that Swing House has no interest in The Tender Box or Jared James Nichols, but contends that inclusion of artists' management fees and expenses in Swing House's Offering Memorandum for both The Tender Box and Jared James Nichols is a mistake.  Tr. at 62:27 (Jaurigui Testimony, Sept. 17, 2021).

b.    Jaurigui contends that Swing House has no interest in Jared James Nichols, but states that he might have made a mistake when he signed the Warren Huart Letter Agreement, Exhibit 26 at 46-53, on behalf of Swing House Rehearsal and Recording, Inc. with respect to that contract between Warren Huart, Jared James Nichols, and Swing House.  Tr. at 63:4 (Jaurigui Testimony, Sept. 17, 2021).

c.    Jaurigui contends that the projected expenses in Swing House's *pro forma* projections for Jared James Nichols in Swing House's Offering Memorandum, Exhibit 6-18 was an error.  Tr. at 56:18 (Jaurigui Testimony, Sept. 17, 2021).

d.    Jaurigui contends that categories of expenses and income for Jared James Nichols were mismarked.  Tr. at 55:17-21; 58:17-27; (Jaurigui Testimony, Sept. 17, 2021).

e.    Jaurigui contends that Team Rock made a mistake on an agreement that Jaurigui signed on behalf of Swing House Artists' Management.  Tr. at 96:11 (Jaurigui Testimony, Sept. 27, 2021).  Proposed Finding of Fact No. 181, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 142.  The court declines to adopt Swing House's fact no. 181 in

its proposed findings of fact and conclusions of law, ECF 107, and its subparagraphs, because it is not supported by the evidence as discussed herein.

204.    In fact no. 182 of Swing House's proposed findings of fact and conclusions of law, ECF 107, Swing House contends that Jaurigui denies that Swing House accrued any rights is identified as a label in the Co-Publishing Agreement but offered no credible explanation why Kobalt's reports show Swing House's Master Recording Rights,  Proposed Finding of Fact No. 182, Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107, citing, Exhibit 28 at 1 through 5 or Synch Rights, Exhibit 28 at 23.  The court declines to adopt Swing House's fact no. 182 in its proposed findings of fact and conclusions of law, ECF 107, because it is not supported by the evidence as discussed herein.

205.    In Swing House's proposed finding of fact no. 183, it asserts that Jaurigui is indebted to it in the sum of $106,400 as follows:

| $31,765 Master Synchs | 50% Ownership | $15,882 |
|---|---|---|
| | 20% Management Fee | 6,355 |
| | 10% Administration Fee | 3,177 |
| $259,954 Publishing Rights | 20% Management Fee | 51,991 |
| | 10% Administrative Fee | 25,995 |
| Post Chapter 11 Earnings | | 3,000 |
| | | $106,400 |

For the reasons stated herein, the court finds that Swing House has not proven any of these alleged damages by a preponderance of the evidence.

## III.    CONCLUSIONS OF LAW

In this adversary proceeding, Swing House seeks a determination of its claims that the debts owed by Jaurigui to it are nondischargeable pursuant to 11 U.S.C. § 523.  This statute contains provisions for excepting debts owed by a debtor to a creditor from discharge. Swing House asserts specifically that the debts owed to him by Jaurigui should be excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6).  "Creditors seeking a

1   nondischargeability determination must first establish an *enforceable claim* under state law

2   (whether or not the claim has been filed in the bankruptcy proceeding)."  March, Ahart and

3   Shapiro, *Rutter Group California Practice Guide: Bankruptcy*, ¶ 22-1641 (online edition,

4   December 2021 update) (emphasis in original), *citing, In re Dobos*, 603 B.R. 31, 38-39 (9th

5   Cir. BAP 2019) ("the existence of a valid claim is a precondition to any action under § 523,"

6   dismissing nondischargeability complaint where creditors' state-court judgment had expired

7   and was thus no longer enforceable).  This is so because the statutory language of 11 U.S.C. §

8   523 does not provide for the creation of debts, but rather for determination of such existing

9   debts as nondischargable under certain conditions.  *Del Bino v. Bailey* (*In re Bailey*), 197 F.3d

10  997, 1001 (9th Cir. 1999) (bankruptcy law governs whether a claim is nondischargeable

11  pursuant to 11 U.S.C. § 523, state law determines whether the creditor has a claim against

12  debtor, such as for the tort of conversion).

13          In Swing House's proposed findings of fact and conclusions of law, it contends that

14  Jaurigui owes it a debt of $106,400,   Swing House's Proposed Findings of Fact and

15  Conclusions of Law after Trial, ECF 107 at 32 (internal page citation 29).  However, since

16  none of the debts allegedly owed by Jaurigui have been determined and liquidated in any legal

17  action, and to determine Swing House's claims for nondischargeability of debt, the court will

18  have to determine whether there are underlying debts owed by Jaurigui to it under state law.

19          Swing House's adversary complaint does not allege any state law claims against

20  Jaurigui. The complaint only alleges federal law claims under the Bankruptcy Code, 11 U.S.C.,

21  for determination of dischargeability of debt and for denial of discharge.  In its first claim for

22  relief under 11 U.S.C. § 523(a)(4), Swing House alleges that the debt owed by Jaurigui is for

23  money and property that were obtained through embezzlement of corporate assets.   Complaint,

24  ECF 1, ¶¶ 86-94.  In its second claim for relief under 11 U.S.C. § 523(a)(6), Swing House

25  alleges that the debt owed by Jaurigui to it is for a willful and malicious injury.  Complaint,

26  ECF 1, ¶¶ 105-123. The substantive basis under state law for these claims asserting debts owed

27  by Jaurigui is conversion and intentional interference with prospective economic advantage.

28  Conversion and intentional interference with prospective economic advantage are not alleged

by Swing House in separate claims under state law, but as the basis for its two federal

bankruptcy claims for relief under 11 U.S.C. § 523(a).

The amount of the debt that Jaurigui allegedly owes Swing House has not been

previously liquidated as it has not filed any lawsuit in state court against Jaurigui. Swing House

in this adversary proceeding asserts liability of Jaurigui for a debt owed to it based on

embezzlement pursuant to 11 U.S.C. § 523(a)(4) and the state law torts of conversion and

intentional interference with prospective economic advantage pursuant to 11 U.S.C.

§523(a)(6).

Claims under 11 U.S.C. § 523(a) are proven by a preponderance of the evidence.

*Grogan v. Garner*, 498 U.S. 279, 291 (1991).

A.      Swing House's Claim under 11 U.S.C. § 523(a)(4)(B).

In its complaint, Swing House asserts a claim for nondischargeability of debt under 11

U.S.C. § 523(a)(4) which provides in pertinent part that "[a] discharge under section 727 ... of

this title does not discharge an individual debtor from any debt ... (4) for fraud or defalcation

while acting in a fiduciary capacity, embezzlement, or larceny."  As reflected in Swing House's

proposed findings of fact and conclusions of law, it asserts that Jaurigui is liable to it for

embezzlement: "Jaurigui embezzled Swing House's assets."  ECF 107 at 32 (internal page

citation 29).

"Embezzlement is the fraudulent appropriation of property by one to whom it is

entrusted or into whose hands it has lawfully come."  *Moore v. United States,* 160 U.S. 268,

269-270 (1895).  The elements of a claim of embezzlement under 11 U.S.C. § 523(a)(4) are: (1)

property rightfully in the possession of a nonowner; (2) the nonowner's appropriation of the

property to use other than which it was entrusted; and (3) circumstances indicating fraud.  *In re*

*Littleton,* 942 F.2d 551, 555 (9th Cir. 1991).

Swing House's embezzlement claim under 11 U.S.C. § 523(a)(4) is set forth in its

proposed conclusions of law as follows:

Swing House's Board of Directors first considered Chapter 11 in April 2015,
more than 18 months before filing its petition. In June 2015, investors discussed
making Jaurigui an at-will employee. In September 2015, Swing House's Board of

Directors required that Mover co-manage Swing House along with Jaurigui and installed Winsen as Director of Operations in October 2015. The inferences the court draws from this uncontroverted evidence is that in 2015, Swing House was in financial trouble and investors were questioning Jaurigui's role; it is reasonable to infer that Jaurigui knew his use and diversion of Swing House's assets to benefit his "own" artists under "his" management would be questioned and he could foresee that his exclusive oversight would end. In June 2015, Jaurigui instructed Kobalt to divert royalty payments from Swing House to Tender Box in order to bypass scrutiny. And after that date, Swing House recorded no revenue from Kobalt.

Jaurigui never denied that he used Swing House's assets to further the careers of Jared and Tender Box by advancing expenses and permitting free rehearsal and recording time. Jaurigui's diversion of royalties to Tender Box was part of Jaurigui's scheme to divert assets. He deliberately fashioned his misleading signature block on his Swing House e-mail account--leaving it up to the reader to determine whether Swing House or Jaurigui engaged in artist management and who's client a particular artist might be. Jaurigui admits that he kept a few thousand dollars after Swing House filed its Chapter 11 case.

Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107 at 32-33 (internal page citation 29-30).

Alternatively, Swing House argues that Jaurigui is liable for embezzlement under 11 U.S.C. § 523(a)(4) because he should be equitably estopped from asserting an ownership right in Swing House's rights in The Tender Box or Jared, stating as follows:

The Ninth Circuit has noted the "importance of full disclosure in bankruptcy proceedings 'cannot be overemphasized'; *Ah Quin v. Cty. Of Kauai Dep't of Transp.*, 733 F.3d 267, 272-273 (9th Cir. 2013), quoting *In re Coastal Plains, Inc.,*179 F.3d 197, 208 (5th Cir. 1999); *In re An-Tze Cheng*, 308 B.R. 448, 458 (9th Cir. BAP 2004). Swing House's financial statements from 2011 to its 2016 projections included line items for expenses and income attributable to Jared and Tender Box. Including those items as part of Swing House's Offering Memorandum, a document that was specifically crafted for distribution to potential investors is evidence that Jared and Tender Box are Swing House's clients, not Jaurigui's, and any earnings or rights arising out of publishing agreements with third parties belong exclusively to Swing House. Jaurigui intended that Swing House's potential investors view it as a recording studio with a growing stable of up-and-coming artists when he knew that Swing House's only relationship to Tender Box or Jared was based on alleged oral contracts.

Jaurigui, as primary author of Swing House's Offering Memorandum and as Swing House's president responsible for its contents, is equitably estopped from denying that Jared and Tender Box are Swing House's clients. Equitable estoppel is a "remedial judicial doctrine employe[d] to [e]nsure fairness, prevent injustice and do equity." *Spray, Gould & Bowers v. Associate Int'l Ins. Co.*, 71 Cal. App.4th 1250 (1999). The court made findings demonstrating Jaurigui's execution of multiple

contracts representing that Swing House owned rights in Jared's and Tender Box's songs and he cannot subsequently deny Swing House's interests, claiming them for himself. He admitted receipt of a few thousand dollars after Swing House filed Chapter 11 which is part of the damages that should be disgorged to Swing House.

Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107 at 33-34 (internal page citation 30-31).

As a second alternative argument, Swing House argues that Jaurigui is liable for embezzlement under 11 U.S.C. § 523(a)(4) because he should be judicially estopped from asserting an ownership right in Swing House's rights in The Tender Box or Jared, stating as follows:

By failing to list Jared and Tender Box as assets in his own bankruptcy schedules, Jaurigui is judicially estopped from claiming that he owns any rights emanating from either Jared's or Tender Box's licensing or publishing agreement. *Hamilton v. State Farm Fire & Cas. Co*., 270 f.3d 778 (9th Cir. 2001). "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Id*. at 783, citing Rissetto v. Plumbers & Steamfitters Local, 343, 94 F.3d 597, 600-601 (9th Cir. 1996). In Rissotto, the Ninth Circuit held that he application of judicial estoppel is not limited to block inconsistent litigation in the same litigation "but is also appropriate to bar litigants from making incompatible statements in two different cases." *Id*. at 605.

Swing House, on the other hand, introduced evidence that Kobalt paid royalties on account of various rights in Tender Box directly to Tender Box's bank account, after to Jaurigui's instructions to no longer send royalty payments to Swing House. The court concludes that Swing House owns any rights emanating from the contracts that he executed on Swing House's behalf. Jaurigui's undisputed actions, taken together, infer a fraudulent intent to deprive Swing House of income and therefore cause injury to Swing House.

Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107 at 34-35 (internal page citation 31-32).

The preponderance of the evidence does not support Swing House's embezzlement claim based on the court's findings of fact above that based on oral arguments between The Tender Box, Jaurigui in personal capacity, and Swing House by Jaurigui in his official capacity, Jaurigui was the personal manager of The Tender Box in his personal capacity rather than his capacity as a Swing House officer, Jaurigui personally was entitled to a 20% management fee from the performance and song royalties the band earned under the 2006 co-

publishing agreement the band had with Kobalt, Jaurigui only managed The Tender Box when it was together from 2006 to 2012, The Tender Box broke up as a band in 2012, and Jaurigui stopped managing it, Jaurigui directed Swing House to advance the band's expenses, but these expenses were to be recouped in full from The Tender Box's performance and song royalties, Swing House was entitled to a 10% administrative fee for administrative services it performed for The Tender Box, such as collecting and distributing the royalties to The Tender Box from Kobalt, the expenses advanced by Swing House to The Tender Box and fees owed to Swing House under their agreement were paid in full in 2014 as shown by Swing House's business ledgers, i.e., Exhibit N, Swing House's Tender Box Recording Expenses Ledger, a few years after the band broke up in 2012, members of The Tender Box wanted to manage their own finances, including the collection and distribution of their royalties under the Kobalt agreement, and in 2015, requested that Swing House and Jaurigui to complete paperwork for The Tender Box to receive its royalties from Kobalt directly than through Swing House, which Swing House completed, and the royalties due under the Kobalt agreement were paid directly to The Tender Box.  The court based these factual findings based on Jaurigui's testimony, which it found to be credible, and the Kobalt Co-Publishing Agreement.  The court notes that Swing House did not call members of The Tender Box or other Swing House personnel to show that Jaurigui's testimony was inaccurate.  Swing House did not offer any written contracts that were inconsistent with Jaurigui's testimony.

The court determines that the arrangement for The Tender Box to collect royalties from Kobalt directly in 2015 was not improper as Swing House now argues because in 2015, the band was defunct, having disbanded in 2012, the band was the owner of the performance and song rights to the music listed in the Kobalt co-publishing agreement, Jaurigui was no longer managing the band since it was disbanded, there was no need for further administration by Swing House since the band was no longer active, and thus, it was reasonable for members of The Tender Box to request, and Swing House then to agree, that the royalties under the Kobalt agreement would go to them directly.  Based on these facts, Swing House has not shown that Jaurigui embezzled its assets by this redirection of the Kobalt royalties to The Tender Box.  As

previously stated, The Tender Box was the owner of the performance and song rights that are
the subject of the Kobalt Co-Publishing Agreement which provided for payment of royalties by
Kobalt for use of those rights, and The Tender Box had agreed to give 20% of its royalties to
Jaurigui for his management and 10% of its royalties to Swing House for administration.
Swing House has not shown that it had any further rights to the Kobalt royalties in 2015 in that
the band was not longer operating, and there was no need for further administration by Swing
House.  Swing House is not entitled to the 20% management fee since Jaurigui in his personal
capacity, not Swing House, was managing The Tender Box.  At that time, as reflected in Swing
House's business records, The Tender Box's obligations to pay Swing House back for the
expenses that Swing House advanced and for administrative fees had been fully paid a year
before in 2014.  That Jaurigui received $2,000 to 3,000 in 2017-2018 from distributions by The
Tender Box paid from its Kobalt royalties for Jaurigui's past managerial services during the
years 2006 to 2012 does not change the result, that is, this fact does not show that an asset of
Swing House was embezzled by Jaurigui as the money was for Jaurigui's past services as the
personal manager of The Tender Box.  Accordingly, the court finds that Swing House has
failed to prove its embezzlement claim as not being able to show that Jaurigui was in
possession of its property, the first element of a claim of embezzlement under 11 U.S.C. §
523(a)(4).  Because Swing House has not shown that Jaurigui had its property, it cannot also
show the other two elements of misappropriation and circumstances indicating fraud.

Regarding Swing House's first alternative argument based on equitable estoppel, the
court finds that its reliance on the Ninth Circuit's decision in *Ah Quin v. Cty. Of Kauai Dep't of
Transp.,* 733 F.3d 267, 272-273 (9th Cir. 2013), stating that the "importance of full disclosure
in bankruptcy proceedings 'cannot be overemphasized'" is misplaced here because Swing
House's equitable estoppel argument is based on what Jaurigui represented in Swing House's
Offering Memorandum, which was distributed to potential investors and lenders, such as
D'Addario and Mover, before Swing House or Jaurigui were in their bankruptcy proceedings,
and thus, the citation to the *Ah Quin* case is inapplicable.

On the merits of Swing House's equitable estoppel argument, it relies upon California case law in asserting that the doctrine applies to Jaurigui because "[e]quitable estoppel is a 'remedial judicial doctrine employe[d] to [e]nsure fairness, prevent injustice and do equity.'" Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107 at 33-34 (internal page citation 30-31), citing and quoting, *Spray, Gould & Bowers v. Associate Int'l Ins. Co.,* 71 Cal. App.4th 1250 (1999). Swing House's equitable estoppel is based on the premise that "[t]he court made findings demonstrating Jaurigui's execution of multiple contracts representing that Swing House owned rights in Jared's and Tender Box's songs and he cannot subsequently deny Swing House's interests, claiming them for himself." *Id.*

The court notes that under California law, "[e]stoppel is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts." *DRG/Beverly Hills, Ltd. v, Chopstix Dim Sum Café and Takeout, III, Ltd.,* 30 Cal.App.4th 54, 59 (1994); *see also,* California Evidence Code, § 623.  As stated in this case, "Four elements must ordinarily be proved to establish an equitable estoppel: (1) The party to be estopped must know the facts; (2) He must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *Id.*  (citation omitted).

First, this is not a situation where equitable estoppel applies as asserted because the conduct of one side, Jaurigui, did not induce the other, Swing House, to take a position that it would be injured if the first should be permitted to repudiate its acts.  The allegedly offending acts were Jaurigui crafting Swing House's financial statements from 2011 to its 2016 projections which included line items for expenses and income attributable to Jared and Tender Box, which raise an inference that Jared and Tender Box are Swing House's clients, and including those items as part of Swing House's Offering Memorandum, a document that was specifically crafted for distribution to potential investors is evidence that Jared and Tender Box are Swing House's clients.  Jaurigui "crafted" the financial statements for Swing House, which were included in Swing House's Offering Memorandum, which were given to potential

1  investors and lenders, and as such, these acts were both Jaurigui's and Swing House's acts.

2  These acts of crafting and distributing the Offering Memorandum were not to induce Swing

3  House to do anything, but were Swing House's acts as well as Jaurigui's act to induce others to

4  invest in or lend to Swing House.  Thus, Swing House cannot rely upon equitable estoppel as

5  to these acts.

6       Second, the elements of equitable estoppel are not met here because there cannot be

7  any showing that Swing House relied on these acts to its injury.  Swing House created and

8  distributed the Offering Memorandum with Jaurigui's assistance, and thus it was an inducing

9  party, and not an induced party.  There is no evidence that Swing House was induced to do

10  anything based on the Offering Memorandum representing that it had income and expenses

11  from managing Jared and The Tender Box, and thus, there was no injury from inducement to

12  support equitable estoppel here, and thus, element (4) for equitable estoppel is lacking.

13       Third, Swing House's equitable estoppel argument is flawed that "[t]he court made

14  findings demonstrating Jaurigui's execution of multiple contracts representing that Swing

15  House owned rights in Jared's and Tender Box's songs and he cannot subsequently deny

16  Swing House's interests, claiming them for himself."  As discussed above, Swing House has

17  failed to show that it has rights in Jared's and the Tender Box's songs, other than perhaps

18  Jared's 10 songs in the Warren Huart Agreement, which had not been shown to have any

19  value.  Moreover, as discussed above, Jaurigui does not claim ownership in the songs of either

20  Jared or The Tender Box, though he had asserted that he might have rights to payment for

21  compensation as their personal manager.

22       Swing House's second alternative argument that Swing House argues that Jaurigui is

23  liable for embezzlement under 11 U.S.C. § 523(a)(4) because he should be judicially estopped

24  from asserting an ownership right in Swing House's rights in The Tender Box or Jared lacks

25  merit.  As the Ninth Circuit has stated, "Judicial estoppel is an equitable doctrine that precludes

26  a party from gaining an advantage by asserting one position, and then later seeking an

27  advantage by taking a clearly inconsistent position."  *Hamilton v. State Farm Fire & Casualty*

28  *Co.,* 270 F.3d 778, 782 (9th Cir. 2001).  According to Swing House, Jaurigui failing to list

Jared and Tender Box as assets in his own bankruptcy schedules, he is judicially estopped from claiming that he owns any rights emanating from either Jared's or Tender Box's licensing or publishing agreement.

Citing and quoting the opinion of the Supreme Court in *New Hampshire v. Maine,* 532 U.S. 742 (2001), the Ninth Circuit cited three factors listed by the Supreme Court that courts may consider in applying the doctrine of judicial estoppel:

> . . . First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled[.]" Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations[.]" A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped[.] In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts. . . .

*Hamilton v. State Farm Fire & Casualty Co.,* 270 F.3d at 782-783, *citing and quoting, New Hampshire v. Maine,* 532 U.S. at 750-751, 121 S.Ct. 1808, 1815 (2001) (citations omitted).

Considering the three factors that the courts may consider in applying judicial estoppel, the court determines that the facts do not apply here. The first factor is not met as Jaurigui's position in this adversary proceeding is not as Swing House asserts, that is, Jaurigui claims rights from Jared's or Tender Box's licensing or publishing agreements. Jaurigui has not claimed rights under these agreements. The evidence indicates that Jaurigui had oral agreements with these artists to act as their managers under which Jaurigui may have been entitled to management fees, Jaurigui no longer acts as their manager and Jaurigui received very little from acting as their manager, particularly Jared, and expects that little will be received for past services from these artists in the future. More importantly, the evidence showed that the artists themselves, The Tender Box and Jared, generally owned the rights to their work, including under the licensing and publishing agreements, and not Swing House. Swing House generally failed to demonstrate that it had contractual rights under the licensing and publishing agreements for Jared and The Tender Box as evidenced in any written

contracts.  The second factor is not met as Jaurigui in not listing any rights in Jared or The

Tender Box in his bankruptcy case "succeeded in persuading a court to accept that party's

earlier position" in that a bankruptcy discharge in the case has been entered, but there is no

judicial acceptance of an inconsistent position in a later proceeding would create "the

perception that either the first or the second court was misled" as Jaurigui in the later

proceeding, this adversary proceeding, has not asserted that he has ownership rights in the

work of The Tender Box or Jared under any licensing and publishing agreements because at

most, he asserted that he might have rights to payment for past services as their manager based

on their oral arguments for his services from accrual of royalties relating to such services,

which appear to have little or no value and little expectation of payment.  Thus, the court finds

that there should be no perception that this court in the first or second proceeding was misled.

The third factor whether the party seeking to assert an inconsistent position would derive an

unfair advantage or impose an unfair detriment on the opposing party if not estopped is not met

as Jaurigui would not derive an unfair advantage in asserting, or that an unfair detriment would

be imposed on Swing House if Jaurigui was not estopped, that Swing House does not have

ownership rights in the licensing and publishing agreements in the work of Jared or The Tender

Box as the evidence in this case shows that Swing House does not have such rights.  The

documentary evidence offered in this case, the music licensing and publishing contracts,

generally do not show that Swing House has ownership rights in the music licensing and

publishing agreements for Jared and The Tender Box, with a minor exception in the 10 Jared

Songs in the Warren Huart Agreement, which has not been shown to have any monetary value.

Accordingly, the court finds that Swing House has not shown that the doctrine of judicial

estoppel applies here.

     Based on the foregoing, the court finds that Swing House has not proven its claim

against Jaurigui under 11 U.S.C. § 523(a)(4) by a preponderance of the evidence.

     B.     Swing House's Claim under 11 U.S.C. § 523(a)(6)

     In its second claim for relief, Swing House alleges that the debts owed by Jaurigui to it

are nondischargeable pursuant to 11 U.S.C. § 523(a)(6), which provides that debts incurred as

the result of willful and malicious injury are not dischargeable. 11 U.S.C. § 523(a)(6).    As

stated by the Ninth Circuit in *Lockerby v. Sierra,* 535 F.3d 1038, 1040, "tortious conduct is a

required element for a finding of nondischargeability under § 523(a)(6)." While federal

bankruptcy law governs whether a claim is excepted from discharge under 11 U.S.C. §

523(a)(6), the federal courts look to state law to determine whether an act falls within the

underlying tort. *In re Bailey,* 197 F.3d 997, 1000 (9th Cir. 1999).

Regarding a claim under 11 U.S.C. § 523(a)(6), the Ninth Circuit has stated, "The

Supreme Court in *Kawaauhau v. Geiger (In re Geiger),* 523 U.S. 57, 118 S.Ct. 974, 140 L. Ed.

2d 90 (1998), made clear that for section 523(a)(6) to apply, the actor must intend the

consequences of the act, not simply the act itself." *Ormsby v. First American Title Co. of

Nevada (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010). Both willfulness and

maliciousness must be proven to prevent discharge of the debt. *Id.* But reckless or negligent

acts are not sufficient to establish that a resulting injury falls within the category of willful and

malicious injuries under § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. at 64.

Willfulness means intent to cause injury. *Kawaauhau v. Geiger*, 523 U.S. at 61. "The

injury must be deliberate or intentional, 'not merely a deliberate or intentional act that leads to

injury.'" *In re Plyam*, 530 B.R. 456, 463 (9th Cir. BAP 2015) (*quoting Kawaauhau v. Geiger*,

523 U.S. at 61) (emphasis in original). The court may consider circumstantial evidence that

may establish what the debtor actually knew when conducting the injury creating action and

not just what the debtor admitted to knowing. *In re Ormsby*, 591 F.3d at 1206 (citation

omitted). Recklessly inflicted injuries, covering injuries from all degrees of recklessness, do

not meet the willfulness requirement of § 523(a)(6). *In re Plyam*, 530 B.R. at 464. Reckless

conduct requires an intent to act instead of an intent to cause injury. *Id.* Therefore, the willful

injury requirement "… is met when the debtor has a subjective motive to inflict injury or when

the debtor believes that injury is substantially certain to result from his own conduct." *Carillo

v. Su (In re Su),* 290 F.3d 1140, 1142 (9th Cir. 2002) (citation omitted).

A malicious injury is one that involves; "(1) a wrongful act, (2) done intentionally, (3)

which necessarily causes injury, and (4) is done without just cause or excuse*." Petralia v.*

*Jercich (In re Jercich),* 238 F.3d 1202, 1209 (9th Cir. 2001). In *Jercich*, the court found that

the debtor's withholding of wages to his employee, despite his ability to pay the employee, and

use of the wage money for his own personal benefit without any just cause or excuse for

withholding the wages, was substantially certain to cause injury to the employee and therefore

fulfilled the malicious prong of § 523(a)(6). *Id.* "Malice may be inferred based on the nature of

the wrongful act", but to make such an inference, willfulness must be established first. *In re*

*Ormsby*, 591 F.3d 1199 at 1207.

       In this case, Swing House argues that the underlying torts for its claim under 11 U.S.C.

§ 523(a)(6) are: (1) conversion; and (2) intentional interference with prospective economic

advantage.

       Regarding conversion, Swing House asserts: "Jaurigui caused Swing House willful

injury when he converted Swing House's property."  Swing House's Proposed Findings of Fact

and Conclusions of Law, ECF 107 at 36 (internal page citation 32).

       Swing House's conversion claim is first based on the premise that it has proven its

"Undisputed Property Rights," arguing:

> The court concludes that Swing House and not Jaurigui owns any rights
> emanating from the publishing contracts or licenses that he executed on Swing House's
> behalf regarding Jared or Tender Box. Further, Jaurigui admitted that Swing House is
> the record label as defined by the Kobalt Co-Publishing as to Tender Box, affording
> Swing House a list of royalty rights, including performance rights, Mechanical Rights,
> Synch Rights, Print Income, Black Box Funds, other income, and cover composition.
> Tender Box additionally 50% of Master Synch Rights to Swing House as label. In
> addition, Swing House, as manager and administrator, has interests in Tender Boxes
> earned income.
>
> Swing House's financial statements and projections attached to its Offering
> Memorandum included line items for expenses and income attributable to Tender Box
> and to Jared as part of Swing House's artists' management division. Notwithstanding
> an abundance of evidence that Swing House owns rights in Tender Box, Jaurigui
> insisted that they are his and testified that he kept royalty payments for himself
> admitting that he converted money owed to Swing House. His conduct was malicious
> because it was intentional. His misleading e-mail signature block reinforces
> premeditation. The timing of his diversion of Tender Box's royalties from Swing House
> coincides with his loss of exclusive and unfettered oversight over Swing House's
> financial affairs.

Moreover, as discussed above, the court has already concluded that Swing House owns rights in Jared or Tender Box and that Jaurigui is equitably and judicially estopped from asserting that he owns any rights pursuant to the contracts that he executed on Swing House's behalf.

Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107 at 36 (internal page citation 33).

Swing House's conversion claim is next based on the premise that it has proven "Jaurigui's Diversion of Swing House's assets," arguing:

The court has concluded that Jaurigui diverted Swing House's assets when he instructed Kobalt to send Tender Box's royalties to Tender Box, avoiding Swing House's books and records.

In *In re Mickens*, 312 B.R. 666 (Bankr. N.D. Cal. 2004), the debtors' failure to turn over sale proceeds to automobile franchisor by depositing into the business' general operating account was willful and malicious, satisfying Section 523(a)(6). That debtor testified that he intended to repay the franchisor once business improved, but such testimony was undermined by evidence that he abandoned the business, which satisfied the requirement that the debtor believed harm was substantially certain to occur. In this case, Jaurigui admits kept at least $2,000-$3,000 in royalty payments that belonged to Swing House during Swing House's Chapter 11—to Swing House's detriment. Jaurigui's diversion of Tender Box's royalties satisfies Mickens as such diversion was substantially certain to harm Swing House by depriving Swing House of its management and administrative fee based on Tender Box's royalties.

Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107 at 37 (internal page citation 34).

Since the parties involved in this adversary proceeding are located in California and the events at issue took place in California, the court applies California law to determine the underlying tort of conversion for Swing House's claim under 11 U.S.C. § 523(a)(6).  As stated by the California Supreme Court in *Lee v. Hanley,* 61 Cal.4th 1225 (2015),

Conversion is the wrongful exercise of dominion over property of another.  The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition or property rights; (3) damages. . . .

*Id.* at 1240 (citations and internal quotation marks omitted).  The evidence does not support a finding of conversion of Swing House's assets by Jaurigui depriving Swing House of its management and administrative fees based on Tender Box's royalties.  The evidence indicates

1    that Swing House was not entitled to any management fees for The Tender Box because

2    Jaurigui, not Swing House, was the personal manager of The Tender Box based on their oral

3    agreement.  The evidence also indicates that Swing House was not entitled to the

4    administrative fees that it claims as the band broke up in 2012, had paid its obligations to

5    Swing House by 2014, including any administrative fees, as shown by Swing House's own

6    business records, i.e., Exhibit N, Swing House's Tender Box Recording Expenses Ledger, and

7    once the band broke up in 2012, there was little, if any, need for Swing House to perform

8    administrative services afterwards since members of The Tender Box had informed Jaurigui

9    and Swing House that they (the members of The Tender Box) wanted to handle their own

10    administrative services.  Based on this evidence, Swing House has failed to prove element (1)

11    for conversion that it had ownership or right to possession of the property it claims that it

12    owns, namely, the purported management and administrative fees based on The Tender Box's

13    royalties.  Accordingly, Swing House has failed to prove conversion as the underlying tort for

14    its claim under 11 U.S.C. § 523(a)(6).

15          Regarding intentional interference with prospective economic advantage, Swing House

16    asserts that "Jaurigui intentionally interfered with Swing House's prospective economic

17    advantage by blocking Swing House's recovery of $87,516, representing 30% management

18    and administrative fees based on Tender Box's royalty in the sum of $291,719 [, and] Royalty

19    rights not paid to Swing House, based on its interest as a result of the CoPublishing Agreement

20    with Kobalt total $106,400."  Swing House's Proposed Findings of Fact and Conclusions of

21    Law, ECF 107 at 39 (internal page citation 36).

22          Swing House's argument on its assertion of tort liability against Jaurigui for intentional

23    interference with prospective economic advantage is as follows:

24

25          The elements of the tort of intentional interference with prospective economic
        advantage requires:

26

27          a. Economic relationship between plaintiff, Swing House and a third party.

28          Jaurigui testified that Swing House had [  ] oral agreements with Tender Box
        and with Jared to manage each band. Swing House and Tender Box also had an oral

agreement that Swing House would administer Tender Box's royalties. Swing House listed management revenues and expenses on its Profit & Loss statements and represented to potential investors that it would continue to incur expenses and earn revenue from Jared and Tender Box in the projections prepared for the Offering Memorandum. Jaurigui, on Swing House's behalf executed multiple contracts for each band. These facts demonstrate that Swing House had an economic relationship with each band. *Westside Center Associates v. Safeway Stores 23*, 42 Cal. App.4th 507, 523 (1996). *See generally*, 5 Witkin, Summary of California Law, Torts (11th Ed. 2017). Further, Tender Box's Co-Publishing Agreement with Kobalt afforded Swing House royalty rights.

b. Jaurigui's knowledge of the relationship.

It is undisputed that Jaurigui, as Swing House's principal knew about Swing House's relationships with Jared and Tender Box.

c. Defendant's intentional acts designed to disrupt the relationship.

As above, Jaurigui engaged in a scheme to deprive Swing House of not just its royalty rights, but to Swing House's management and administrative fees based on Tender Box's royalties. His misleading e-mail signature block reinforces premeditation. The timing of his diversion of Tender Box's royalties from Swing House coincides with his loss of exclusive oversight and unfettered access to Swing House's financial affairs.

d. Actual disruption of the relationship.

In June 2015, Jaurigui instructed Kobalt to divert Tender Box's royalties away from Swing House. Winsen testified that after 2015, Swing House's records show that it no longer received payments from Kobalt to administer for Tender Box, despite evidence that Kobalt continued to pay Tender Box through at least 2018. Jaurigui testified that he kept Swing House's post-petition earnings of a few thousand dollars.

e. Economic harm.

Winsen's testimony and Kobalt's report[s] demonstrate that after the September 2015 email, Kobalt paid $291,719 to Tender Box directly. [12] Swing House is entitled to a 20% management fee and 10% administrative fee on money paid by Kobalt to Tender Box after that date, continuing to today whenever Tender Box's music is used or

---

[12]   Swing House's assertion that Kobalt reports show that Kobalt paid $291,719 *directly* to The Tender Box *after* the September 2015 email is factually unsupported because the Kobalt Reports only show payment of royalty income by Kobalt on account of Silent Music Box (i.e., The Tender Box) for 2016 and afterwards of only a total of $2,689.08 and payment of royalties on Master Sync Rights of $-0- for 2016 and afterwards.  Kobalt Reports, Exhibit 26 at 103-105.  The overall amount of $291,719 paid by Kobalt for Tender Box royalties is correct as shown on the Kobalt Reports, but most of the royalties were paid before 2016, and apparently before the September 2015 email, and paid through Swing House, not to The Tender Box directly.  *Id.; see also,* Jauigui Dec. ¶¶ 91-105.

1    played. Swing House is entitled to its 50% ownership for master synch rights and post-
2    petition earnings that Jaurigui kept for himself. Further, Jaurigui's omission of Jared
     and Tender Box from Swing House's bankruptcy schedules prevented Swing House's
3    proper accounting to the United States Trustee.

4          f. Conduct that was wrongful other than the fact of interference itself.

5          Jaurigui's instruction to Kobalt to divert royalties away from Swing House to
6    administer was part of Jaurigui's misuse of Swing House's assets for his personal gain,
     and to use Swing House as his alter ego. Notwithstanding an abundance of evidence
7    that Swing House owns rights in Tender Box, Jaurigui insists that they are his in his
8    personal capacity and testified that he kept royalty payments for himself, diverting
     Swing House's property rights. His conduct was malicious because it was intentional.
9    His e-mail signature block reinforces disregard of his corporate separateness from
10   Swing House by using a confusing his e-mail signature. He permitted Tender Box to
     rehearse at Swing House without charge. Jaurigui testified that his email was mean[t] to
11   be all encompassing, without regard to his corporate responsibilities to Swing
     House.

12   Swing House's Proposed Findings of Fact and Conclusions of Law, ECF 107 at 37-39 (internal

13   page citation 34-36).

14        Since the parties involved in this adversary proceeding are located in California and the

15   events at issue took place in California, the court applies California law to determine the

16   underlying tort of intentional interference with prospective economic advantage for Swing

17   House's claim under 11 U.S.C. § 523(a)(6).  As stated by the California Supreme Court in

18   *Youst v. Longo,* 43 Cal.3d  64 (1987),

19          The five elements for intentional interference with prospective economic
20   advantage are: (1) an economic relationship between the plaintiff and some third party,
     with the probability of future economic benefit to the plaintiff; (2) the defendant's
21   knowledge of the relationship; (3) intentional acts on the part of the defendant designed
     to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic
22   harm to the plaintiff proximately caused by the actions of the defendant.

23   *Id.* at 71 n. 6 (citation omitted).

24        The evidence does not support Swing House's assertion of tort liability based on

25   intentional interference with prospective economic advantage.  The evidence indicates that the

26   first two elements are undisputed that Swing House had economic relationships with third

27   parties, namely, The Tender Box and Jared, these economic relationships included Jaurigui in

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

his personal capacity, and that as a participant in these economic relationships, Jaurigui knew of these relationships.

However, the evidence does not support the remaining elements that Jaurigui committed intentional acts designed to disrupt the relationships, that there was actual disruption of these relationships and there was economic harm to Swing House proximately caused by Jaurigui's actions.  Regarding the element of defendant's intentional acts designed to disrupt the relationship, Swing House asserts that Jaurigui engaged in a scheme to deprive it of not just its royalty rights, but also of its management and administrative fees based on The Tender Box's royalties.  As discussed above, the evidence in this case does not support these assertions of Swing House because Swing House generally did not have royalty rights in the music of the artists Jared and The Tender Box (with minor exceptions), and thus, there were no such royalty rights that Swing House was deprived of by Jaurigui or anyone else.  Also, as discussed above, the evidence shows that Swing House was not deprived of its management and administrative fees based on The Tender Box's royalties by Jaurigui because Jaurigui, not Swing House, was the manager of The Tender Box, and he, if anyone, was entitled to the management fees, and as shown by Swing House's own business records, namely Exhibit 6, the Tender Box Recording Expenses Ledger, the administrative fees owed to Swing House by The Tender Box was fully paid in 2014, and there were no administrative fees due as The Tender Box disbanded earlier in 2012 and did not have a continuing need for administrative services by Swing House as members of the band informed Swing House in 2015 that it no longer needed its administrative services and wanted to collect The Tender Box's royalties themselves.

Regarding the element of actual disruption of the relationship, Swing House asserts that in 2015, Jaurigui instructed Kobalt to divert Tender Box's royalties away from Swing House.  As discussed above, the evidence in this case does not support these assertions of Swing House because again, in 2015, members of The Tender Box informed Swing House and Jaurigui that the band members wanted to handle the collection of The Tender Box's royalties themselves since the band had split up and was no longer performing, and thus, they had no continuing

need for Swing House's administrative services, and accordingly, Jaurigui and Swing House at

that time were honoring the request of the members of The Tender Box to complete the process

for the band members to receive the royalties directly from Kobalt.  The members of The

Tender Box, who owned the royalties as stated in the Kobalt Co-Publishing Agreement, simply

wanted to collect their royalties directly from Kobalt rather than through Swing House, and if

there was any diversion, it was at the request of the band members who wanted their royalties

diverted back to them.  There was no improper diversion by Jaurigui of Swing House's

royalties here as Swing House did not have any such royalties.

Regarding the element of economic harm to the plaintiff proximately caused by the

actions of the defendant, Swing House asserts that Winsen's testimony and Kobalt reports

demonstrate that after the Swing House September 2015 email to transfer the right to receive

The Tender Box's royalties back to The Tender Box, Kobalt paid $291,719 to The Tender Box,

of which Swing House was entitled to a 20% management fee and a 10% administrative fee on

royalties paid by Kobalt to The Tender Box and that Swing House is entitled to 50% ownership

of its master synch rights.  As discussed above, the evidence in this case does not support these

assertions.  First, the court was not able to find the evidentiary support for this assertion of

Swing House that Kobalt paid $291,719 to The Tender Box after September 2015 as such

amount is not described in Swing House's proposed findings of fact about the Kobalt payment

of royalties to The Tender Box in Swing House's Proposed Findings of Fact and Conclusions

of Law, Proposed Findings of Fact Nos. 120-163.  Swing House in its proposed findings of fact

refer several times to the sum of $259,954 in royalties paid by Kobalt for the publishing rights

of The Tender Box from the third quarter of 2007 through the third quarter of 2017 or 2018.

Proposed Findings of Fact Nos. 137, 154, 155, Swing House's Proposed Findings of Fact and

Conclusions of Law.  Swing House in its proposed findings of fact refer to the sum of $31,765

in royalties paid by Kobalt for the master synch rights of The Tender Box from the first quarter

of 2012 through the second quarter of 2014.  Proposed Findings of Fact No. 157, Swing

House's Proposed Findings of Fact and Conclusions of Law.  If these two amounts are added

together, they total $291,719, but this amount was paid over years from 2007 through 2017 or

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

2018.  According to Swing House, it is entitled to a 20% management fees and a 10% administrative fee from the royalties from the publishing rights, and a 50% share of the royalties on the master synch rights.  As discussed previously, the evidence shows that Swing House is not entitled to the 20% management fee as it was not the manager of The Tender Box, and Jaurigui personally was the band's manager, who was entitled to any such fees.  Swing House was entitled to 10% administrative fees when it administered the collection and distribution of the royalties for The Tender Box when the band was actively performing from 2006 to 2012, but there was no continuing need for Swing House's administrative services once the band broke up in 2012, and thus, the band members discontinued Swing House's administrative services in 2015.  The evidence shows that based on the oral agreement between The Tender Box, Jaurigui and Swing House, Swing House advanced the band's expenses and was entitled to recoup its expenses advanced for the band through payment of 50% of the master synch royalties.  However, as shown by Swing House's own business records, the expenses it advanced and any administrative fees owed to Swing House by The Tender Box were fully paid by 2014 as shown by Tender Box Recording Expenses Ledger.  Thus, there was nothing owed to Swing House because whatever obligation that The Tender Box had was satisfied, and thus, there is no economic harm to Swing House from the alleged intentional interference with prospective economic advantage by Jaurigui.  Accordingly, Swing House has not proven three of the five elements required to establish intentional interference with prospective economic advantage as an underlying tort for Jaurigui's liability under 11 U.S.C. § 523(a)(6).

Because Swing House has not proven either of the torts of conversion or intentional interference with prospective economic advantage underlying its claim under 11 U.S.C. § 523(a)(6), it has failed to sustain its claim under 11 U.S.C. § 523(a)(6).  Based on the foregoing, the court finds that Swing House has not proven its claim against Jaurigui under 11 U.S.C. § 523(a)(6) by a preponderance of the evidence.

///

C.      Swing House's Claim under 11 U.S.C. § 727(a)(4).

Swing House claims that Jaurigui's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4) for making a false oath or claim in bankruptcy. A discharge may be denied if the debtor has made a false oath, claim or promise, or withheld information from any officer of the estate, in or in connection with the present case. 11 U.S.C. § 727(a)(4)(A)-(D). The elements of a claim under 11 U.S.C. § 727(a)(4) are: (1) the debtor made a false oath in connection with the bankruptcy case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently. *In re Retz*, 606 F.3d at 1197 (citation omitted). The false statements must be made under oath during the course of bankruptcy proceedings. *In re Beeber*, 239 B.R. 13, 29 (Bankr. E.D.N.Y. 1999) (filing a false tax return is not a ground for denial of discharge).

The debtor's bankruptcy schedules are signed under penalty of perjury. Thus, a false oath under § 727(a)(4) can involve a false statement or omission in the debtor's schedules. *Premier Capital, LLC v. Crawford* (*In re Crawford*), 841 F.3d 1, 8-9 (1st Cir. 2016) (schedules omitted debtor's interest in retirement account); *Tan v. Tranche 1 (SVP-AMC), Inc.,* (*In re Tan*), 350 B.R. 488, 493-495 (Bankr. N.D. Cal. 2006) (schedules omitted debtor's interests in several closely held corporations).

The debtor's amendment of false schedules does not negate the initial false oath in the original schedules: "The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive." *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011) (internal quotation marks omitted).  However, "a false statement or omission that has no impact on a bankruptcy case is not material and does not provide grounds for denial of a discharge under § 727(a)(4)(A)." *In re Khalil,* 379 B.R. 163, 172 (9th Cir. BAP 2007), citing *In re Fogal Legware of Switz., Inc. v. Wills* (*In re Wills*), 243 B.R. 58, 63 (9th Cir. BAP 1990).

Swing House asserts that Jaurigui's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4) because he made false oaths in signing his bankruptcy schedules under penalty of

perjury wherein the schedules were incomplete and inaccurate because he did not list his 2016

residential refinance transaction and his ownership interests in the future careers and royalty

income in Swing House's artists, Jared and The Tender Box, and because he testified at his

meeting of creditors under 11 U.S.C. § 341(a) on September 4, 2018 that his bankruptcy

schedules were correct, which had omitted disclosure of his 2016 refinance transaction. Swing

House's Proposed Findings of Fact and Conclusions of Law, ECF 107 at 39-42 (internal page

citation 26-39).

Regarding the 2016 refinance transaction, while Swing House notes that Jaurigui and

Greenberg own the residence as joint tenants, it points out that Jaurigui originally purchased it

with his ex-wife in 2002 and kept it after their divorce, but added Greenberg on title, though

she did not pay him any sum of money for being added on title.  As Swing House described

Jaurigui's testimony at the meeting of creditors in this case, within 90 days of the filing of

Jaurigui's Chapter 11 bankruptcy case, they refinanced the residence, taking out $140,000 in

cash from equity, and Greenberg kept at least one half of the cash, and Jaurigui used the

balance to pay his own and Swing House's attorneys' fees.  Swing House points out that

neither Jaurigui's refinance of his personal residence nor his transfer of equity as a result of the

2016 refinance was disclosed in his bankruptcy schedules.  These facts are generally

undisputed, but Swing House's characterization of the refinance implies that Jaurigui made a

transfer of realized equity in his residence of $140,000, half to Greenberg, and half to his

lawyers.

In considering the refinance transaction, the court determines that even though Jaurigui

made a gift to Greenberg of a one-half interest in his residence, she is a co-owner of the

property as a joint tenant and was legally entitled to one-half of the surplus refinancing

proceeds of $140,000, or $70,000.  Thus, Greenberg as a co-owner of the property is properly

allocated her one-half share of the surplus refinancing proceeds, $70,000, and only the other

half of surplus refinancing proceeds should be considered as property of Jaurigui, the debtor,

for purposes of 11 U.S.C. § 727(a)(4).

Jaurigui's credible and uncontroverted testimony at trial was that when he undertook the refinance transaction, he was planning to use his $70,000 share of the refinance proceeds to fund the anticipated settlement between Swing House and its landlord, 7175 WB, but when the settlement fell through, he used the funds to pay attorneys' fees for filing bankruptcy cases on behalf of Swing House and himself.  There is no dispute that Jaurigui used his share of the refinance proceeds for attorneys' fees to fund the filing and prosecution of this bankruptcy case and Swing House's Chapter 11 bankruptcy case.  As to Greenberg's share of the refinance proceeds, Jaurigui gave credible and uncontroverted testimony at trial that she used the funds to pay for household expenses for herself, for Jaurigui and their son.

This circumstantial evidence does not indicate an intent to "hinder, delay, or defraud" a creditor or an officer of the estate charged with custody of property, though the debtor, Jaurigui, transferred his property, i.e., $70,000 in equity taken out of his and Greenberg's residence, within one year before the petition filing date.  Greenberg who was entitled to her $70,000 share of the refinance proceeds used the funds to pay for household expenses for herself, for Jaurigui and for their son since they were still living together at the time.  Jaurigui's intent to take out the equity from the residence was to fund the settlement that Swing House was reaching with its former landlord, 7175 WB, which was something that Mover had encouraged.  However, when the settlement between Swing House and 7175 WB did not go through, Jaurigui used his share of the refinance proceeds to pay fees for attorneys to file Chapter 11 bankruptcy cases for Swing House and himself, which is also something that Mover had encouraged as shown by one of his emails to D'Addario Co. and Jaurigui.  Thus, the subject property, Jaurigui's $70,000 share of the refinance proceeds was not concealed or transferred with intent to hinder, delay or defraud a creditor, but originally, to resolve a litigation dispute to avoid bankruptcy, and when that settlement attempt failed, Jaurigui used the funds to seek bankruptcy relief to address the financial distress that he and his business, Swing House, were having.  Jaurigui's transfers of his $70,000 share of the refinance proceeds to pay attorneys' fees of bankruptcy counsel to file and prosecute Chapter 11 bankruptcy cases for Swing House and himself were transfers for fair consideration to the lawyers for their

1   anticipated services in preparing to file Swing House's and Jaurigui's Chapter 11 bankruptcy

2   cases, which are not transfers with intent to hinder, delay or defraud creditors as "substantial"

3   or fair consideration was given by the attorneys rendering services to Swing House and

4   Jaurigui.  *See* March, Ahart and Shapiro, *Rutter Group California Practice Guide: Bankruptcy*,

5   ¶ 22:870, *citing*, *In re Goldstein*, 66 B.R. 909, 918 (Bankr. W.D. Pa. 1986).

6          It is not disputed that Jaurigui made an oath for purposes of 11 U.S.C. § 727(a)(4) when

7   he signed his bankruptcy petition and schedules under a declaration of penalty of perjury. One

8   of the elements that Swing House must prove by a preponderance of the evidence is that the

9   allegedly false oath made by Jaurigui related to a material fact. While Jaurigui's schedules were

10  not complete and accurate, it does not appear that the omissions identified by Swing House

11  were material. With respect to the 2016 residential refinancing transaction not disclosed on the

12  bankruptcy schedules, the nondisclosure became known at one of Jaurigui's meeting of

13  creditors when he was asked by the Chapter 7 trustee about the transaction.  Jaurigui disclosed

14  at the meeting of creditors that he and his partner, Alexandra Greenberg, refinanced the loan

15  and existing trust deed on their residence with a new loan and trust deed of $140,000.

16         The amount of equity taken out by Jaurigui from his and Greenberg's residence is

17  $70,000, and that is the amount at issue regarding Mover's claim under 11 U.S.C. § 727(a)(4)

18  as Greenberg as a co-owning joint tenant was entitled to half of the equity taken out in the

19  refinancing, regardless of whether she received her interest in the property from Jaurigui as a

20  gift.  As previously discussed, Jaurigui's $70,000 share of the refinance proceeds was not

21  concealed or transferred with intent to hinder, delay or defraud a creditor, but originally, to

22  resolve a litigation dispute to avoid bankruptcy, and when that settlement attempt failed,

23  Jaurigui used the funds to seek bankruptcy relief to address the financial distress that he and his

24  business, Swing House, were having.  Jaurigui's transfers of his $70,000 share of the refinance

25  proceeds to pay attorneys' fees of bankruptcy counsel to file and prosecute Chapter 11

26  bankruptcy cases for Swing House and himself were transfers for fair consideration to the

27  lawyers for their anticipated services in preparing to file Swing House's and Jaurigui's Chapter

28  11 bankruptcy cases, which are not transfers with intent to hinder, delay or defraud creditors as

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

"substantial" or fair consideration was given by the attorneys rendering services to Swing

House and Jaurigui.  The transfers of equity realized from Jaurigui's refinance transaction to

the attorneys should have been disclosed on his statement of financial affairs but the transfers

are not material as they were given for fair consideration for work to be performed by the

attorneys in preparing to file Swing House's and Jaurigui's Chapter 11 bankruptcy cases,

which would not be avoidable preferential or fraudulent transfers.

As to Swing House's claim that Jaurigui concealed his property or property of the

bankruptcy estate, that is, by failing to disclose his rights to money arising out of his

management of performing artists, Jared and The Tender Box on his bankruptcy schedules, the

court finds there was no concealment.  First, as to Jared, Jaurigui was Jared's manager at one

time, but they had no written agreement, and based on their trial testimony, while Jared is still

performing, Jaurigui stopped managing Jared and is not managing Jared at this time.  Swing

House made no showing that Jaurigui had any existing rights to Jared's future income or

royalties.  Jaurigui admitted in his trial testimony that Jared may owe him a few thousand

dollars, but this testimony was vague and nonspecific and did not evidence the existence of a

continuing debt.  Second, as to The Tender Box, Jaurigui was the band's manager at one time,

but they had no written agreement, and based on Jaurigui's uncontroverted trial testimony, the

band is no longer performing, Jaurigui is no longer managing it.  Swing House has not made an

adequate showing that Jaurigui had any continuing rights to The Tender Box's future income

or royalties that had value at the time of Jaurigui's bankruptcy filing in 2016 as The Tender

Box had disbanded four years earlier in 2012 and Jaurigui was no longer its manager and the

monies paid to Jaurigui for his prior management of the band after 2014 when Swing House's

advanced expenses were fully paid were *de minimis*.

With respect to Jaurigui's omission on his schedules of the alleged ownership interests

in the future careers and royalty income in the artists, Jared and The Tender Box, there is no

showing that this omission is material and prejudicial to creditors since these items of personal

property were of *de minimis* value.  First, as to Jared, Jaurigui was Jared's manager at one time,

but they had no written agreement, and based on their trial testimony, while Jared is still

performing, Jaurigui is not managing Jared at this time.  Mover made no showing that Jaurigui

had any existing rights to Jared's future income or royalties.  Jaurigui admitted in his trial

testimony that Jared may owe him a few thousand dollars, but this testimony was vague and

nonspecific and did not evidence the existence of a continuing debt.  Second, as to The Tender

Box, Jaurigui was the band's manager at one time, but they had no written agreement, and

based on Jaurigui's uncontroverted trial testimony, the band is no longer performing, Jaurigui

is no longer managing it.  Swing House had made no showing that Jaurigui had any existing

rights to The Tender Box's future income or royalties. Given the minimal value of these assets,

which probably have little liquidation value, the omission of these items is not material.

Given the lack of evidence demonstrating materiality of the facts that Jaurigui allegedly had

made a false oath, the court finds that Swing House has not met its burden of proving its claim

under 11 U.S.C. § 727(a)(4) to deny Jaurigui's discharge by making a false oath by a

preponderance of the evidence.

### IV.    JAURIGUI'S AFFIRMATIVE DEFENSES

1.    As set forth in the Joint Pretrial Stipulation, Jaurigui has withdrawn or waived

his First, Second, Third, Fourth, Fifth, Tenth and Twelfth Affirmative Defenses.  JPTS at 30.

2.    Jaurigui asserts as Sixth and Ninth Affirmative Defenses that Swing House

failed to use reasonable means to prevent any alleged damage and failure to use reasonable

means to mitigate any alleged damages or knew of any alleged acts by him allegedly damaging

it, but did not take action to controvert, stop or prevent such acts.  These affirmative defenses

are moot as the court finds that Swing House did not suffer any alleged damages asserted in its

claims.

3.    Jaurigui asserts as Seventh and Eighth Affirmative Defenses are that Swing

House has suffered no damage and are barred by his right of set-off against any such damages.

These affirmative defenses are moot as the court finds that Swing House did not suffer any

alleged damages asserted in its claims.

///

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)

1

### V.    CONCLUSION

2    Based on the foregoing, the court will deny Swing House's claims under 11 U.S.C. §§

3  523(a)(4), 523(a)(6), 727(a)(2) and 727(a)(4) and will enter judgment in Jaurigui's favor

4  against Swing House in this adversary proceeding determining that he has no liability to Swing

5  House based on its claims and that he should not be denied his discharge in this bankruptcy

6  case.

7    Jaurigui is hereby directed to lodge a proposed judgment in this adversary proceeding

8  consistent with these findings of fact and conclusions of law within 30 days of the date of entry

9  of these findings of fact and conclusions of law.

10    IT IS SO ORDERED.

11                                           ###

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Date: September 14, 2022

26                                       _____
                                         Robert Kwan
                                         United States Bankruptcy Judge
27

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(SWING HOUSE REHEARSAL AND RECORDING, INC. V. JAURIGUI)